[Civ. No. 19610.   First Dist., Div. One.   Feb. 21, 1962.]

AMERICAN AUTOMOBILE INSURANCE COMPANY, Plaintiff and Appellant, v. TRANSPORT INDEMNITY COMPANY et al., Defendants and Appellants.

544

Bledsoe, Smith, Cathcart, Johnson & Phelps and R. S. Cathcart for Plaintiff and Appellant.

Clark, Heafey & Martin for Defendants and Appellants.

TOBRINER, J.—This is another of the plethora of cases coming to the courts in which insurance carriers engage in an internecine struggle to determine which carrier should discharge a loss under primary and "excess" coverage provisions. In entering the legalistic labyrinth of the provisions of the policies, we are not favored, like Theseus, with any thread of principle; each case apparently presents a particularistic and unique problem. The obscurities of overlapping coverage have, indeed, led some experts to urge legislative clarification.[1] In the absence of such statutory definition, our

[1] "Faced with the maze created by the policy provisions, statutes, and varying concepts of the industry, it is not difficult to see why the courts have been unable to evolve a rule which can establish tiers of liability for the insurers and at the same time cover most of the situations in which the problem arises. The clause matching method has proven to be as unsatisfactory a solution as the earlier formulas it replaced. Attempts to find the answer in a presumed intent of the insurers, in the absence of binding contractual relations between them, can only result in a case by case handling of the conflicts. In the absence of a solution through the policies themselves, legislative action appears to be the best remedy. . . . Such legislation should be directed toward producing the greatest stability without needless duplication of administrative handling. Statutory control of the 'other insurance' clauses appears to be the approach which will produce this result without undue complexity." (Russ: *The Double Insurance Problem—A Proposal*—Hastings L. J. (1961) vol. 13, no. 2, pp. 183, 191.)

efforts in interpreting the policies in this case have led us, with one exception as to the apportionment of liability, to the same basic conclusion as the trial judge.

American Automobile Insurance Company (hereinafter called American) brought this action for declaratory relief to adjudicate its liability as against that of two other insurance companies: Transport Indemnity Company (hereinafter called Transport) and Security Mutual Casualty Company (hereinafter called Security). The claim arose because of the negligence of a truck driver, employed by Culy Transportation Company (hereinafter called Culy) in delivering four blocks of metal to General Grinding Company (hereinafter called General); in unloading the truck, the driver and Rea negligently pushed a block from it, thereby injuring a small girl who was passing by the truck. The foreman of General, Walter Bardon, directed the driver to unload the truck at a designated point, and Bardon assigned one of the company's employees to participate in the unloading operation.

American insured Bardon and General; the other two insurers covered liability arising from use of the Culy truck. We face these questions on appeal: (1) Did the loss fall under the excess provisions of the American policy? (2) Are two of the other policies excess or primary insurance, under their terms? (3) Ultimately, what is the proper method of apportionment of the liabilities? As we shall explain in more detail *infra,* we have concluded that the trial court properly rendered affirmative answers to the first two queries; we have differed with it in one respect in its analysis of the third problem.

The parties have agreed that the appeal rests upon the facts set out in an abbreviated reporter's transcript. We incorporate the clear statement of the events as described by Judge Preston Devine of the superior court: "On May 9, 1955, Culy Transportation, by its driver Guerrero, drove its truck, containing four steel blocks, each weighing between 400 and 600 pounds, to the Grinding Company's yard. That company ordinarily would have removed the blocks from the truck by a crane, but the crane was out of order. Grinding Company's foreman, Bardon, and one of its machinists, Rea, talked with driver Guerrero about unloading the blocks. Bardon told Guerrero to place the truck in position where the blocks could be thrown off into some dirt which was part of 8th Street in Oakland (there was no sidewalk).

"When this conversation took place, the truck was in the yard, and Bardon realized that to have thrown them off would have broken both the cement paving of the yard and the edges of the blocks. Bardon also told Guerrero that Rea would help him, according to Guerrero, and although Bardon's testimony is that he did not 'specifically' assign Rea to the task of helping, he admits that he left Rea in the yard for the purpose of helping Guerrero, and Rea testified that he knew he was there for the purpose of 'assisting the truck.' His ordinary duties were those of a machinist, and there was no other purpose of his being left in the yard than to help to get the truck unloaded.

"The truck was placed where Bardon had directed it should be, though Bardon had returned to the shop before the movement was made. Rea gave the signal to Guerrero as to the exact point to stop. Both men then got onto the rear of the trailer and pushed one block off onto the dirt. Then the two men maneuvered the second block on the trailer to a place near the middle, where it would not strike either the cement or the first block; Guerrero said everything was clear, and the two men pushed the block off. Just as it left the trailer, Guerrero saw a leg coming around the back of the trailer. This was the leg of the little girl, and it was struck by the block.

"As to knowledge of the possible presence of children, there are these facts: 1. Bardon knew that children walked down the street on their way to school, but usually in the center of the street, because there was no real sidewalk. 2. At this time, the truck blocked two-thirds of the street. 3. He had never seen children walk along the side of the street where the accident happened. Rea knew there were children walking around there (on other occasions), but never paid much attention. His back was turned towards the direction from which the girl came. Guerrero had 'heard kids talking' on the Hayward, or south, side (the girl came from the other, or north, side), but he did not hear them while he was resting for about 20 seconds before pushing the second block off. He had looked to see if there was anyone coming before the first block was pushed off, and looked again, while resting, before the second block was dropped; all he could see was about five feet of the roadway. The men did not have any conversation 'about whether anybody would be walking by there.'

"That there was negligence in the operation is hardly to

be denied, and the settlement of the tort case, if not an outright admission of that fact, is at least a strong indication that negligence cannot be gainsaid.''

American, insurer of General, and Transport, one of the two insurers of the Culy truck, settled the claim for $75,000, each contributing one-half, but by agreement the two companies reserved the right to bring an action for declaratory relief to obtain contribution. American brought this action against Transport and Security to recover the $37,500 which it paid in settlement of the claim. The court entered a judgment assessing the liability of American at $5,555.55, of Security at $4,444.45 and of Transport at $65,000. Although all parties are appealing from this judgment, American will be designated as respondent and Transport and Security as appellants.

The relevant insurance policies are the following:

1. *American policy*: The policy is a comprehensive liability policy which covers several named partners of General, including Walter Bardon. The bodily injury provisions read: ''A—Bodily Injury Liability—Automobile. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . sustained by any person, and arising out of the ownership, maintenance or use of any automobile, including the loading and unloading thereof. B—Bodily Injury Liability—Except Automobile. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . sustained by any person.''

As to injury to one person, the coverage is $50,000. The policy specifically provides that it is excess coverage as to injuries arising out of the use of a nonowned automobile; Clause 13 states in part ''the insurance under this policy shall be excess insurance with respect (1) to loss arising out of the maintenance or use of any hired automobile or nonowned automobile. . . .''

2. *Transport policy* (No. 52-001): The policy insures Culy as a motor carrier for hire for $10,000 (bodily injury); however, an endorsement pursuant to a regulation of the Public Utilities Commission establishes a limit of liability of $15,000 for injury or death of one person. The policy contains a provision covering permissive users of automobiles of the private passenger type only.

3. *Security policy*: The policy is entitled "Excess Insurance Contract" and provides the same coverage for Culy as the underlying policy, Transport No. 52-001, except that it is excess over $10,000. In another provision the policy states that it is excess as to all primary or underlying insurance. The policy limits are $40,000.

4. *Transport policy* (No. 52-002): This is an excess policy identical with the Security policy, except that it has a limit of $450,000 liability and is excess over $50,000.

As we have stated, we agree with the trial court's ruling that the first Transport policy (No. 52-001) is primary and the remaining policies are excess. We treat *infra* the apportionment of the excess liabilities among the carriers. The crucial conclusion of the trial court that the excess provision and not the general comprehensive liability of the American policy applies finds support in two alternative theories. The first, stemming from the specific language of the policy, holds that the American excess clause takes effect because the loss arose out of the *use* of a nonowned automobile; the second, set out by the trial court, rests upon the proposition that the primary and excess policies of Transport and Security issued on the truck cover Bardon as a permissive user and that American's coverage was excess.

Turning to the first proposition, we note that the language of the American policy provides for the application of the excess provision for any loss arising out of the use of any nonowned automobile. The terms of the policy only require that the insured be liable for a loss arising from the use of the truck. They do not state that the *insured* himself use the truck, nor that his liability arise from his personal negligence while using the truck. The policy describes coverage in Clause A for "Bodily Injury Liability—Automobile" for "bodily injury . . . sustained by any person, and arising out of the . . . use of any automobile, including the loading and unloading thereof." The coverage under "B—Bodily Injury Liability—Except Automobile" covers "all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . sustained by any person." There can be no question but that the provisions of the policy afforded coverage of the loss, whether it resulted from Bardon's "independent negligence" or his negligent use of the truck as a permissive user.

The coverage, however, was modified or reduced by the

thirteenth condition of the policy as to "Other Insurance" which declared it to be "excess insurance" as to "loss arising out of . . . use of any . . . non-owned automobile. . . ." The loss here did occur in the unloading of a truck not owned by the insured but by the trucking company. The Transport policy admittedly covered the loss caused by the negligent unloading of the truck by Guerrero and Rea.[2] As we shall point out, such unloading constituted a use of the truck; the excess provision of American necessarily attached.

Both the courts and the commentators have interpreted the word "use" broadly; the case of City of Santa Monica v. Royal Indem. Co. (1958) 157 Cal.App.2d 50 [320 P.2d 136] offers an apt illustration of this approach. In that case two passengers suffered injuries caused by the wheel of a tram passing over a defective manhole maintained by the City of Santa Monica. The policy covered injuries " 'caused by accident and arising out of the ownership, maintenance or use of the automobile' " (tram). (P. 52.) The court held "[t]here is no room for doubt that the accident in question arose out of the use of the automobile." (P. 55.) Yet the city's negligence in maintaining the manhole bore no closer connection to the accident, which coincided with the operation of the tram, than did Bardon's negligence to the loss here which concurred with the unloading of the truck. The loss occurred in the use of the tram although it resulted from the negligent maintenance of the manhole cover.

In the recent case of Columbia Southern Chemical Corp. v. Manufacturers & Wholesalers Indem. Exch. (1961) 190 Cal. App.2d 194 [11 Cal.Rptr. 762] the court, holding that the term "using" included loading and unloading a truck, said, "The term 'using,' when used in a policy without restrictive terms, must be understood in its most comprehensive sense. It does not require that the injury be the direct and proximate result in any strict legal sense of the active movement of the motor vehicle covered by the policy." (P. 202.) In reaching this conclusion the court pointed out, "Thus, in applying the coverage paid for by the insurance premium,

---

[2]Appellants state: "The trial Court found as a fact that both Guerrero and Rea were negligent in unloading the truck and that such negligence was a proximate cause of the injury to Bobbie Green, and the Court further found as a fact that Rea was a permissive 'user' of the Culy truck and as such was entitled to coverage under the Transport policy in accordance with Section 415 of the Vehicle Code and the decisions in the cases hereinabove cited. With these findings we have no quarrel."

the term 'loading and unloading' has been applied to cover many phases of that operation which do not involve direct activity of the vehicle. (*General Accident Fire & Life Ins. Corp.* v. *Hanley Oil Co.,* 321 Mass. 72 [72 N.E.2d 1, 171 A.L.R. 497] [overflow of fuel oil in cellar on delivery]; *American Auto. Ins. Co.* v. *American Fid. & Cas. Co.,* 106 Cal.App.2d 630, 635 [1] [235 P.2d 645] and numerous cases there cited [escape of oil from terminal facilities after delivery from truck]; *Employers etc. Ins. Co.* v. *Pacific Indem. Co.,* 167 Cal.App.2d 369, 375 [2] [334 P.2d 658] [piling dropped from load crane, crane not a part of truck].)'' (P. 203.)

Similarly in *Pleasant Valley Assn.* v. *Cal-Farm Ins. Co.* (1956) 142 Cal.App.2d 126 [298 P.2d 109] a liability policy covering the plaintiff Association provided that coverage would be excess as to liability arising out of the use of a non-owned automobile. The employees of the Association negligently placed wooden blocks under the wheels of a truck and failed to warn the driver. As a result the driver suffered injury. The court held that the accident arose out of the use of a nonowned automobile. Although the negligence of the Association's employees may have been more immediate to the unloading operations than Bardon's, the court held that the accident, resulting from the negligence of the employees of the party obtaining delivery, involved the use of a nonowned automobile.

As Hartwick states in ''How to Read a Liability Insurance Policy,'' 13 Hastings Law Journal (1961) vol. 13, no. 2, pp. 175, 177-178, ''The word 'use' has been given a very broad meaning by the courts. If, for example, a person were loading or unloading goods into or from the automobile, and on the way to or from the car bumps into and injures a pedestrian, the resulting claim arises out of the 'use' of the automobile and is covered. (See *Maryland Cas. Co.* v. *Tighe* (9 Cir. 1940) 115 F.2d 297.) One significant point here is that the automobile need not be, in the legal sense, the proximate cause of the claim; the events giving rise to the claim must, however, arise out of and be related to its use.''

The cases uniformly accord to the word ''use'' a broad definition. We have pointed out that the present injury arose out of the use of the truck. The very terms of the American policy provide that, without regard to the particular party who may have used the truck, American's

coverage is excess and not primary insurance; this is a case arising out of the use of a nonowned automobile.

■ The second and alternative basis for holding that the excess clause of American applies, as we have explained *supra,* rests upon the theory that Bardon was in substance a user of the truck; that Bardon's negligence was negligence in the use of the truck; that such negligence was covered by the Transport and Security policies and American is excess.

This theory holds that Bardon's liability arises from his own conduct, not from vicarious liability for the acts of Rea, whom he assigned to assist Guerrero in the unloading. The parties agree that American would not be liable for Bardon's amenability as respondeat superior. But Bardon's own, or independent, negligence lay in his failure to post a guard to warn persons using the street to watch for the danger. Bardon knew or should have known of the jeopardy to which passing children were exposed by the operation. In the words of the trial judge, "Bardon knew that the blocks weighed 400 or 500 pounds; knew that one man could not remove them; knew that when they struck they would do damage to the cement paving if they hit on it, and so was careful to have the truck move clear of the pavement; knew, or as a partner should have known, that the drop was to take place, not on company property, but on the public street, even though on a little used portion of it. There was a 'realizable likelihood' that such an accident would occur, whether or not by negligence of the immediate actors." Although the facts justify a finding that Bardon should have foreseen injury occurring in exactly the manner in which it did occur, even if we concede that he might not have contemplated this particular contingency, he remains liable for the result. (*Gibson* v. *Garcia* (1950) 96 Cal.App.2d 681, 685 [216 P.2d 119]; *Carroll* v. *Central Counties Gas Co.* (1925) 74 Cal.App. 303, 307 [240 P. 53]; *Ferroggiaro* v. *Bowline* (1957) 153 Cal.App.2d 759, 763 [315 P.2d 446].)

Further, the intervention of the negligence of Rea and Guerrero does not relieve Bardon of liability, since he should have reasonably foreseen that, without a guard, they might act without due care and drop the blocks in such a manner as to injure a passerby. Since any such intervening negligence was foreseeable, it could not serve as a superseding cause of the injury and insulate Bardon from liability. Bardon's negligence still remains a proximate cause of the injury. (*Gibson*

v. *Garcia, supra,* 96 Cal.App.2d 681, 684; *Ferroggiaro* v. *Bowline, supra,* 153 Cal.App.2d 759, 763.)

If Bardon's negligence occurred in the use of the truck, he became a permissive user under the Transport and Security policies. Although these policies did not expressly include omnibus clauses as to permissive use, section 415 of the Vehicle Code, as it read prior to the 1957 amendment, imposed upon carriers such liability for permissive use. Thus the section in part provided: "Such policy [motor vehicle liability policy] shall insure the person named therein *and any other person using or responsible for the use of said motor vehicle* or motor vehicles with the express or implied permission of said assured." (Stats. 1943, ch. 911, § 12, pp. 2761, 2767; emphasis added.) The Supreme Court in *Wildman* v. *Government Employees' Ins. Co.* (1957) 48 Cal.2d 31, 39 [307 P.2d 359], specifically incorporated these provisions in an insurance policy as to an accident which occurred in 1955, saying, "It appears that section 415 must be made a part of every policy of insurance issued by an insurer since the public policy of this state is to make owners of motor vehicles financially responsible to those injured by them in the operation of such vehicles. . . . We are of the opinion that for an insurer to issue a policy of insurance which does not cover an accident which occurs when a person, other than the insured, is driving with the permission and consent of the insured is a violation of the public policy of this state as set forth in sections 402 and 415 of the Vehicle Code." (P. 39.)

The statute provided that the policy must insure the person responsible for using the truck; Bardon, here, was responsible for the particular usage of the Culy truck. As we have pointed out, Bardon not only directed where the truck was to unload but also assigned the employee of General, Rea, to participate in the unloading.

The recent case of *Continental Cas. Co.* v. *Zurich Ins. Co.* (1961) 57 Cal.2d 27 [17 Cal.Rptr. 12, 366 P.2d 455], indicates that Bardon became an insured under the Transport and Security policies, by reason of his responsibility for the use of the truck, which included the conduct of Bardon's employee, Rea. In *Zurich* Simpson Redwood Company (hereinafter called Simpson) hired Hiatt, an independent logger, to log and haul timber. Hiatt hired several trucks from Waldkirch, who also supplied drivers to operate the trucks. Gudger, a driver and employee of Waldkirch, was injured due to the

negligence of Hiatt's employees in loading the truck and recovered a judgment against Hiatt under the doctrine of respondeat superior. The court held Simpson's insurer, General Insurance Company of America (hereinafter called General) and Continental Casualty Company (hereinafter called Continental) "liable on a pro rata basis for the balance of the judgment against Hiatt over and above the primary coverage provided by Zurich," resting such liability upon a clause extending coverage to " 'any person while using an automobile owned or hired by the named insured [Simpson] . . . provided the actual use is with the permission of the named insured. . . .' " (Pp. 35, 32.)

After holding the truck to be a "hired automobile" within the terms of the General policy, because the hiring was with the "consent" of Simpson, the court dismissed General's contention that Hiatt was not covered because *he* was not "using" the truck. In this regard the court ruled that "using" a truck includes the loading and unloading of the vehicle; the General policy covered the trucking company's operation which was effected through its employees. Hiatt's employees loaded the lumber truck. In the instant case Bardon's employee unloaded the truck. Thus, here, Bardon became an insured under the Transport and Security policies in the same manner as Hiatt became an insured under the General and Continental policies.

Specifically, in *Zurich,* Continental, the insurer of Hiatt, and General, the insurer of Simpson, each incorporated a clause in their policies that their coverage was excess as to any loss " 'arising out of the . . . use of any non-owned' " automobile. (P. 34.) The court held that these provisions were effective and that only Zurich, the insurer of Waldkirch, the truck owner, provided primary coverage, saying, "It is thus evident that under the quoted principles the trial court was correct in its view that the Zurich (Waldkirch-owner) policy provided primary insurance to Hiatt for the loading accident, and that the General and the Continental policies were excess only and should be prorated after the Zurich primary coverage had been exhausted." (P. 35.) The clauses in those policies are substantially identical with the excess provision in the American policy. The excess provisions of the policies applied despite the fact that Hiatt did not personally use the truck. Likewise, in the instant case, the loss falls within the excess provision of the American policy, even though Bardon

did not personally use the truck. It is no answer to say that Bardon was "*independently* negligent." Just as in *Zurich*, the *loss* here arose out of the use of a nonowned automobile.

In passing upon a factual situation analogous to the instant one, the United States Court of Appeals for the Eighth Circuit in *Liberty Mutual Ins. Co.* v. *Steenberg Construction Co.* (1955) 225 F.2d 294 convincingly states the philosophy of the approach we apply here. In that case a general contractor, to whom a subcontractor was "making delivery of mixed concrete," supervised and signalled "from the rear of the truck, the course to be taken by the driver on the premises, in backing the truck to the spot where the general contractor desired to have the concrete dumped." (P. 295.) The supervising, signalling and backing operations resulted in injury to a third party. The liability of the carrier turned upon the applicability of an omnibus clause which parallels section 415 of the Vehicle Code.

The Court of Appeals sustained the trial court in holding that "the active directing by the general contractor of the backward movement of the truck and the admitted following by the subcontractor's driver of the signals so given him— particularly since both of these things had been done as incidents of the construction work and both had proximately contributed to occasion the accident—made the participation of the general contractor such an immediate part of the actual operating of the truck as to constitute the general contractor, in a sufficient legal sense, a person 'using the automobile,' or in any event a person *'legally responsible for the use thereof,'* within the language and coverage of the omnibus clause of the policy." (P. 296; emphasis added.)

The Court of Appeals explains that "it might be historically pointed out that omnibus clauses fundamentally have had their impetus from a public demand—crystallized specifically in some states into a statutory requirement, and effected generally in the rest through insurance-writing competition—that an insurer who is engaged in selling protection against negligent use of motor vehicles, and who undertakes to provide such coverage for a particular vehicle, ought, in both business and social fairness, as much to have a liability for a use of the machine on the part of another, resting in the named insured's permission, as for such a use by the named insured personally." (P. 296.) The court holds "The trend and effect of judicial decision in the particular field have resultingly been

to read and apply purported omnibus clauses as liberally as possible. . . ." (P. 296.)

An even deeper reason for adoption of the theory of permissive user coverage as to Bardon lies in the legislative purpose in enacting financial responsibility laws. The Legislature sought to protect drivers from loss suffered from injuries inflicted by uninsured drivers. The mounting danger to the innocent driver on our over-crowded highways impelled such legislation. In urging the liberal construction of such laws, Justice Schauer, writing for the court in *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 434 [296 P.2d 801, 57 A.L.R.2d 914], stated such legislation was: "fundamentally, designed to give monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways themselves suffer grave injury through the negligent use of those highways by others."

To the extent that Bardon gave general directions as to the place and manner of the unloading of the truck, and assigned an employee to participate in it, he was responsible for its use. To the extent that the truck driver followed Bardon's instructions, the driver yielded to Bardon control of the truck. While it is true that Bardon left the scene of operations and did not physically engage in them at the moment of their execution, his directions and the presence of the assigned employee did not expire with his departure. These facts all tend to show a yielding of control of the truck to Bardon and his assumption of some responsibility in regard to it. In the words of the Court of Appeals, Bardon "was, jointly with the subcontractor, *responsible* for the movement of truck, in the mutual purpose being served by its immediate use at the time of the accident, and . . . there could accordingly be no possible legal escape from the fact that the general contractor necessarily was a 'person or organization *responsible for the use thereof.*' " (P. 297; emphasis added.) (See *Osborne* v. *Security Ins. Co.* (1957) 155 Cal.App.2d 201, 211 [318 P.2d 94], as to coverage of the phrase " 'any person . . . legally responsible for the use thereof' " with respect to parents' liability for son's use of the vehicle.)

We do not think that *Gamble-Skogmo, Inc.* v. *Saint Paul Mercury Indem. Co.* (1954) 242 Minn. 91 [64 N.W.2d 380], a case upon which Transport and Security place great emphasis, applies to the instant situation. There an accident occurred "in attempting to assemble the swather hitch and

tilting bar" (p. 383 [64 N.W.2d]) of a piece of farm equipment immediately *prior* to the unloading of that equipment. The injury resulted from the failure of the manufacturer to afford adequate instructions for the assembly of the farm implement. The question arose whether the insurance carrier covering the general liability and risk of the manufacturer or the carrier insuring the automobile risk should be held liable. The court found that the connection of the negligent act of the manufacturer was "too remote" from the "unloading operations" to hold that the injury "arose out of the use or unloading of an automobile within the terms of the Hartford or American policies." (P. 393 [64 N.W.2d].) In the instant case, however, the injury occurred during and not prior to the unloading of the truck; the negligence did relate to the unloading since Bardon designated the place and method of the unloading and assigned an employee to participate in it. The relationship of Bardon to the unloading of the truck here differs fundamentally from the separate and remote failure of the erring manufacturer in the cited case properly to instruct on assembling the equipment.

Having concluded that the excess provisions of the American policy covered the loss, we examine, and reject, the argument of American that Security's policy and Transport's second policy are primary. American argues that "Since the 'underlying policy issued by the Transport Indemnity Company' (Transport's policy 52-001) was, by force of the Public Utilities endorsement, *primary*, it logically follows that Transport's policy 52-002 which affords 'the same coverage,' is likewise primary." Hence, American argues, in the " 'hierarchy of coverage' " the Transport-Security policies are primary. We believe the trial court completely answered the contention: "But there is a particular statement in each of these policies that it is excess over any primary. Particular expressions control those which are general (§ 3534, Civil Code), and the very word 'underlying' implies a differentiation. They should be held, reasonably, to refer to the species of underlying coverage, whether property damage, public liability, collision, etc."

There is no reason why the excess clause in the policy of the owners of the truck should not be effective or why such an excess clause should not be treated in the same manner as American's excess provisions. ██ As the court stated in *Peerless Cas. Co.* v. *Continental Cas. Co.* (1956) 144 Cal.

App.2d 617, 626 [301 P.2d 602] : "We must conclude that when a policy which provides excess insurance above a stated amount of primary insurance contains provisions which make it also excess insurance above all other insurance which contributes to the payment of the loss together with the specifically stated primary insurance, such clause will be given effect as written."

We turn now to the problem of apportionment of the $75,000 settlement among the three insurers. Clearly, the first $15,000 must fall upon the primary Transport policy (No. 52-001) ; all of the other policies provide only excess coverage. As concurrent insurers, "each is liable in the proportion which the collectible amount of each policy bears to the total collectible amount of excess insurance. . . ." (*Employers etc. Corp.* v. *Pacific etc. Ins. Co.* (1951) 102 Cal.App.2d 188, 191 [227 P.2d 53].) Transport's second policy (No. 52-002), however, is excess over $50,000; therefore, until the payments reach a total of $50,000, the second Transport policy does not enter into the apportionment.

Our first step in computing the apportionment of the payments is the application of the primary insurance under Transport's first policy in the amount of $15,000. Our next step is to determine the participation in the payment of $35,000, the amount remaining, after payment of Transport's $15,000, to reach the $50,000 minimum limit of the second Transport policy. The $35,000 must be paid *before* we bring in the second Transport policy because that policy becomes payable only *after* the payment of $50,000. American and Security must share the payment of this $35,000. The American policy of $50,000 and the Security policy of $40,000 total $90,000 ; American thus pays 50/90ths of $35,000 or $19,444.44 and Security pays 40/90ths of that amount or $15,555.56. The liability of the carriers, before the second Transport policy is available, shows the following picture:

From Transport Policy No. 52-001 . . . . . . . . . . $15,000.00
From American Automobile Policy No.
  K-208 7547 50/90ths of $35,000 or . . . . . . . . 19,444.44
From Security Mutual Policy No. T-136
  40/90ths of $35,000 or . . . . . . . . . . . . . . . . . . . 15,555.56
     Total . . . . . . . . . . . . . . . . . . . . . . . . . . . $50,000.00

We turn now to the method of meeting the payment of the remaining $25,000 of the settlement. The balance of the

American policy is $30,555.56; the balance of the Security policy amounts to $24,444.44; the Transport policy is $450,000; the total of all of these equals $505,000. The fractional proportions of the whole liability for each carrier thus becomes:

| | | |
|---|---|---|
| American | 30,555.56/505,000 | $ 1,512.65 |
| Security | 24,444.44/505,000 | 1,210.13 |
| Transport | 450,000.00/505,000 | 22,277.21 |
| Total | | $24,999.99 |

We set forth the total amounts accordingly due:

| | |
|---|---|
| Transport Policy No. 52-001 | $15,000.00 |
| American Automobile Policy No. K-208 7547 | 20,957.09 |
| Security Mutual Policy No. T-136 | 16,765.69 |
| Transport Policy No. 52-002 | 22,277.22 |
| Total | $75,000.00 |

Since American paid the sum of $37,500 toward the settlement but would be liable only for $20,957.09, it should recover the sum of $16,542.91.

The problem of determining the liability of multiple insurers, which arises with increasing complexity (see Russ, *op. cit. supra*, fn. 1, p. 184) presently compels the bare interpretation of the policies and a reconciliation of intricate and sometimes conflicting clauses. Without further legislative guidance we can do no more. The Minotaur has not devoured us. With the exception noted we believe the trial court properly performed the function of interpretation.

We modify the judgment to provide that American recover from Security the sum of $16,542.91 and that Transport recover from Security the sum of $222.78. We affirm the judgment as modified. The costs on appeal are to be borne equally by the parties.

Bray, P. J., and Sullivan, J., concurred.