[Civ. No. 35411. Second Dist., Div. Two. Oct. 22, 1970.]

CAMAY DRILLING COMPANY, Plaintiff and Appellant, v. TRAVELERS INDEMNITY COMPANY, Defendant and Respondent.

**COUNSEL**

Wise, Kilpatrick & Clayton and R. J. Kilpatrick for Plaintiff and Appellant.

Schell & Delamer, Fred B. Belanger and Charles H. Carpenter for Defendant and Respondent.

**OPINION**

**HERNDON, J.**—Camay Drilling Company appeals from a judgment in favor of Travelers Indemnity Company in a declaratory relief action brought by Camay.

Ulysses Kelley, an employee of B & Y Stanton House Movers, was injured while engaged in the process of moving an oil derrick belonging to Camay a short distance from one drilling location to another. Kelley filed an action against Camay alleging that prior to the commencement of the moving operation Camay "so negligently attached a certain pipe to said oil derrick in such fashion that said pipe was caused to fall after the said oil derrick was moved to the new location." That action is now pending.

Appellant brought the present action against Travelers, insurer of B & Y under a comprehensive liability insurance policy, to force Travelers to defend it in Kelley's action and to determine the rights and obligations of the parties under the policy. The theory of the present action is that Camay was "using" B & Y's trucks during the move and is thus an additional insured under the policy issued by Travelers to B & Y.

The trial court, sitting without a jury, determined that Camay was not using the insured vehicles nor legally responsible for their use. It concluded that Camay was not an "insured" under the Travelers policy and that Travelers was not obligated to defend Kelley's action. Camay appeals from the judgment contending that as a matter of law it was "using" B & Y's trucks at the time of the accident and that the accident arose out of the use of said trucks. We have concluded that the trial court decided the determinative issue of law correctly.

Camay was engaged in drilling oil wells on Pier J in Long Beach, California, and retained the services of B & Y to move a derrick on December 17, 1965, from one drilling site to another, a distance of about 300 feet. B & Y used two house-moving trucks equipped with winches which were powered by the trucks' motors. Cables running from the winches were attached to the derrick which rested on rollers. The trucks would move into a position 50 to 100 feet from the derrick, stop, winch the derrick forward, move to new positions, and repeat the operation until the movement of the derrick was completed.

Kelley was the foreman for B & Y in charge of the moving operation. While checking a plumb bob, which was suspended within the framework, to determine how much further the derrick was to be moved, Kelley was struck by a piece of flow pipe which fell from the derrick. At that time the derrick was within three-quarters of an inch of its intended destination. The winching had stopped while Kelley was checking the plumb bob, but the cables were still connected from the trucks to the derrick and were taut.

Camay and B & Y had been dealing with each other for 20 years. Camay, pursuant to a practice between it and B & Y, prepared the derrick for the move, dismantling and disengaging certain equipment used in connection with drilling operations and securing certain loose equipment on the derrick including the flow pipe. B & Y employees had exclusive control over the move itself. As the trial court expressly found, referring to B & Y as the "Mover":

"The Mover was an independent contractor; and Camay neither exercised nor had the right to exercise any control over the use of the Mover's vehicles and was interested only in the result of the moving operation and not in the

methods or details of the work and did not assume any control or supervision over the Mover's trucks and there was no causal connection between the use of said trucks and the falling of the flow pipe or between the use and operation of the Mover's trucks and the accident. Camay was neither 'using' said insured vehicles nor was Camay legally responsible for their use within the meaning of said automobile insurance policy. Under the 'Definition of Insured' clause of such insurance contract, the contract extends coverage to one other than the named insured only if such other person is using the vehicle or is legally responsible for its use."

The comprehensive liability policy issued by Travelers, which admittedly covered the two trucks used in the move, required Travelers to defend bodily injury suits and pay damages arising out of such suits brought against the "insured." "Insured" is defined in the policy to include the named insured as well as "any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission."

We have concluded that the decision of the trial court in this case is strongly supported by the reasoning of the recent decision of our Supreme Court in *International Business Machines Corp.* v. *Truck Ins. Exch.,* 2 Cal. 3d 1026 [89 Cal.Rptr. 615, 474 P.2d 431]. That decision enunciates a sensible limitation upon the proper application of the "use" concept in determining the extent of insurance coverage for the permissive use of motor vehicles. Its reasoning exposes the unrealistic and unjust effects of further extending this concept to the point where it operates to transfer liability from the negligent entity to the insurer for the innocent entity—especially in cases in which the motor vehicle was only a peripheral, inactive or incidental factor.

We deem it unnecessary to lengthen this opinion with a detailed recital of the factual setting of this decision or with a repetitious analysis of the earlier precedents therein discussed. The following quotation from the opinion of the Supreme Court at page 1032 is deemed sufficient for present purposes: "A holding that IBM is a 'user' of the truck and that the trucker's carrier should meet the loss would free the dock owner from responsibility for the maintenance of its own premises, and fasten liability upon the insurance carrier whose insured was the least culpable. Almost all of the cases presenting the issue of 'use' of the vehicle by the shipper involved disputes between two insurance companies, as does this case, and a holding that the shipper constitutes a 'user' of the vehicle generally results in a transfer of all or part of the ultimate liability from the insurer for the negligent entity to the insurer of an innocent entity. Such a ruling secures for the shipper an insurance rate

disproportionately low relative to the hazards of his business and may ultimately tend to discourage the shipper from exerting due care in the maintenance of the premises. Moreover, the injured person in these cases is almost always an employee of the trucker, acting within the course of his employment, and thus entitled to workmen's compensation for his injuries, as well as to his tort action against the negligent shipper. So far as we have discovered, the combination of injury to a third party and a possibly financially irresponsible shipper has occurred in only one reported case, *American Auto. Ins. Co.* v. *Transport Indem. Co.* (1962) 200 Cal.App.2d 543 [19 Cal.Rptr. 558]."

These valid and realistic considerations were also recognized in the well reasoned decision in *Pacific Indem. Co.* v. *Truck Ins. Exch.*, 270 Cal.App. 2d 700, 703, 704-705 [76 Cal.Rptr. 281], wherein the court observed:

"The statutory omnibus clause establishes two conditions of extended coverage: one, the vehicle's *use* with the owner's permission, and two, liability for damages *arising out of* the vehicle's ownership, maintenance or use. Most traffic accidents involve operation or 'use' of the vehicle, hence fit the verbal forms of extended coverage with nicety. Nontraffic accidents in which the vehicle is a peripheral factor often have factual contours ill-shaped to these verbal forms. The insurance carriers seek to shift or share their losses, settling the easy cases or leaving them unappealed, presenting the more bizarre accidents to the appellate courts. The latter must then decide whether the unusual facts fit the generalized formulae of extended coverage which, relative to those facts, are now metamorphosed into ambiguity. . . .

"Recognizing that vehicle liability policies stop somewhere short of all-risk coverage, these descriptions [of sequential relationships between the vehicle and the accident] seek to define a point at which the vehicle passes from an incidental to a focal role in the accident. At the risk of bringing coals to Newcastle, still another test may be hazarded. The notion of law-imposed damages arising out of an activity strongly connotes an actionable wrong committed in the conduct of the activity. In the present case, of course, negligence was the actionable wrong. The actionable negligence lay in the maintenance of . . . [a third party's] equipment, not in his maintenance or use of the insured truck. In the words of the *Missouri* decision quoted in *Webb* [*Truck Ins. Exch.* v. *Webb*, 256 Cal.App.2d 140, 145-146 (63 Cal.Rptr. 791)] (fn. 5, *supra*), the injury was directly caused by an 'independent act, or intervening cause wholly disassociated from, independent of and remote from the use of the [automobile].' "

The reasoning of the above quoted decisions of our Supreme Court in *International Business Machines Corp.* v. *Truck Ins. Exch., supra,* 2 Cal.3d

1026, and of the Court of Appeal in *Pacific Indem. Co.* v. *Truck Ins. Exch., supra,* 270 Cal.App.2d 700, is equally applicable and determinative in the case at bench. The trucks insured by respondent herein were being used solely as movable winches utilized in dragging appellant's equipment a few hundred feet. No third party user of the highway was involved and the relationship between the injured party and his employer under the terms of the California Workmen's Compensation law or otherwise is not an issue.[1] In such circumstance to require the non-negligent policyholder's insurance carrier to finance its employee's damage claim for the sole benefit of the negligent appellant's carrier would serve none of the beneficent dictates of public policy enunciated in *Continental Cas. Co.* v. *Phoenix Constr. Co.,* 46 Cal.2d 423, 434 [296 P.2d 801, 57 A.L.R.2d 914], and in *Wildman* v. *Government Employees' Ins. Co.,* 48 Cal.2d 31, 39-40 [307 P.2d 359].

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 17, 1970.

---

[1]Whether or not B & Y would be entitled to recover on a lien for its workmen's compensation payments to Kelley asserted in his action against Camay is not an issue presently before us and we mean to express no opinion thereon. That is to say, in describing B & Y as the *"non-negligent* policyholder," we have reference only to the active negligence that allegedly caused Kelley's injuries herein, rather than to any possible violation of B & Y's statutory duty to provide its employees with a safe place to work.