[Civ. No. 37973. Second Dist., Div. Two. June 29, 1972.]

HARBOR INSURANCE COMPANY, Plaintiff and Respondent, v. EMPLOYERS' SURPLUS LINES INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Kirtland & Packard and Harold J. Hunter, Jr., for Defendant and Appellant.

Wyman, Bautzer, Rothman & Kuchel and Charles L. Fonarow for Plaintiff and Respondent.

## OPINION

**HERNDON, J.**—As indicated by its complaint, the purpose of plaintiff Harbor Insurance Company (Harbor) in bringing this action for declaratory

relief was to obtain a judgment declaring that two other insurance companies, the defendants Employers' Surplus Lines Insurance Company (Employers) and Pacific Indemnity Company (Pacific) should carry the burden of defending a pending action for personal injuries and that one or both of them should provide the indemnity in the event of a recovery by the plaintiff in that other pending case.

The previously pending personal injury action was filed by one Lewis Miller. He had named as defendants Harbor's insured, the Weeshoff Construction Company (Weeshoff) and its employee, LeRoy Grossenbach. Miller sought recovery of the damages which he allegedly had suffered as the proximate result of the negligence of Weeshoff's employee, Grossenbach, in the accident hereinafter described.

Defendant Employers is the insurer of Owl Rock Products Company (Owl). Lewis Miller was an employee of Owl at the time of the accident. Defendant Pacific is the insurer under the provisions of another policy naming Weeshoff as the insured. Harbor alleged that it had undertaken the defense of Weeshoff after the defendant carriers had refused to assume it.

After a nonjury trial, the court below entered judgment in favor of plaintiff Harbor and against defendant Employers. The judgment declared that the policy of the defendant Pacific did not provide coverage. No appeal was taken from that portion of the judgment. Employers appeals attacking the conclusion of the trial court that a truck and trailer owned by its insured, Owl, was being used by Harbor's insured, Weeshoff, at the time of the accident.

■ We have concluded that the judgment under review erroneously transfers liability from Harbor, the insurer of Weeshoff, the allegedly negligent entity, to Employers, the insurer of Owl, an innocent entity, in violation of the law as enunciated in recent decisions of the California Supreme Court dealing with the "use" concept in the loading and unloading of freight-carrying vehicles. These decisions include *International Business Machines Corp.* v. *Truck Ins. Exch.*, 2 Cal.3d 1026 [89 Cal.Rptr. 615, 474 P.2d 431]; *Argonaut Ins. Co.* v. *Transport Indem. Co.*, 6 Cal.3d 496 [99 Cal.Rptr. 617, 492 P.2d 673]; and *Entz* v. *Fidelity & Casualty Co.*, 64 Cal.2d 379 [50 Cal.Rptr. 190, 412 P.2d 382], to which may be added the decision of this court in *Camay Drilling Co.* v. *Travelers Indem. Co.*, 12 Cal.App.3d 237 [90 Cal.Rptr. 710].

## Statement of the Facts

The stipulated facts are as follows: "The accident in question occurred

on August 28, 1968, at a construction site at 1300 Shoemaker Road, Santa Fe Springs, California. At the time of the accident a tractor trailer owned by Owl Constructors or Owl Rock Products Company, both hereafter referred to simply as Owl, had been driven to the premises by Lewis Miller for the purpose of picking up and transporting to another job site a D-8 Caterpillar tractor. The Owl driver, Lewis Miller, who at all times herein concerned was acting within his employment by Owl and was using the trailer with the permission of Owl, notified employees of Weeshoff Construction Company of his arrival for the purpose of picking up the Caterpillar tractor. Miller parked the Owl trailer in the yard so that the Caterpillar tractor could be loaded. In order to facilitate the loading of the Caterpillar tractor onto the bed of the trailer which was several feet above the ground, a large pile of dirt was fashioned into a ramp near the rear of the trailer so that the Caterpillar tractor could be driven up the dirt ramp and onto the trailer.

"LeRoy Grossenbach, who was at all times herein concerned an employee of Weeshoff Construction Company, acting within the scope of his employment, operated the Caterpillar tractor and used same to fashion the dirt ramp for the loading operation. When the ramp was completed, Grossenbach noticed that the Caterpillar tractor engine had overheated somewhat and that there was dirt thereon. Therefore, prior to driving the Caterpillar tractor onto the Owl trailer, he stopped the Caterpillar tractor at a hose outlet several feet away from the dirt ramp and the Owl trailer. With the motor still running, Grossenbach and another employee, John Akridge, proceeded to water and clean the engine of the Caterpillar tractor.

"During the entire operation of building the loading ramp and the subsequent washing of the engine, Lewis Miller observed the activity and gave whatever assistance he could. When Grossenbach and Akridge completed the watering and cleaning of the Caterpillar tractor engine, one of them said that the Caterpillar tractor was ready to be loaded, and Grossenbach got into the driver's seat and began moving the Caterpillar tractor toward the trailer, intending to load same on the trailer.

"In the meantime, Lewis Miller, who had overheard the statement that the Caterpillar tractor was now going to be loaded, started walking toward the Owl trailer. Immediately thereafter the Caterpillar tractor came into contact with the body of Lewis Miller, resulting in his injury.

"Miller thereafter instituted an action in this court for personal injuries against both Weeshoff Construction Company and its employee LeRoy Grossenbach, being case No. NEC 8031.

"At the time of the accident, defendant Employers' Surplus Lines Insur-

ance Company had in effect its policy No. E 510999 covering Owl as named insured. The policy extended coverage to the Owl tractor trailer which Miller had driven to the construction site prior to the accident. Also in effect at the time of the accident were two policies of insurance issued to Weeshoff Construction Company. These policies were Pacific Indemnity Company's policy No. A 465043 and plaintiff Harbor Insurance Company's policy No. 104652. Lewis Miller is joined in as a defendant in this action since he is an interested party in the interrelationship of the coverages extended by the three insurers for the accident in question.

"The Caterpillar tractor owned by Weeshoff Construction Company was not licensed by the Department of Motor Vehicles and was never driven on the public highway. Weeshoff Construction Company agreed to pay a sum to Owl Constructors for the purpose of transporting the Caterpillar tractor from the job site in question to another job site."

The foregoing stipulated facts are amplified by the depositions of Miller and of Weeshoff's employees, Akridge and Grossenbach, which were offered and received in evidence as plaintiff's exhibits 5, 6 and 7. The testimony of these witnesses confirmed the stipulated fact that Grossenbach used the Caterpillar tractor to construct a dirt ramp to be used in loading Weeshoff's Caterpillar tractor onto Owl's truck trailer. Akridge was Weeshoff's superintendent on the job site and Grossenbach worked under his direction.

As the work of constructing the dirt ramp was being completed, Akridge and Grossenbach noticed that the engine of the tractor was overheating. For the purpose of ascertaining the cause of this condition, Akridge directed Grossenbach to drive the tractor to a place in an adjacent yard approximately 125 feet distant from the dirt ramp where there was an available water outlet and a hose.

Akridge described the purpose of this movement of the tractor and the nature of the remedial work as follows: "Q. How long had the Cat been parked there while you did that work? A. Approximately 25, 30 minutes, maybe longer, maybe a few minutes less. Approximately 20 minutes or 30 minutes. Q. Did anybody besides you participate in cleaning out the radiator of that Cat during that time? A. Yes, sir. Q. Who? A. LeRoy Grossenbach. Q. What did the two of you do besides squirting the hose into the radiator, if anything? A. Well, we cleaned the dirt out of the belly pan and underneath the radiator. Q. How did you do that? A. By putting the hose down in there and washing the dirt down through the pan and out under the bottom of the Cat. Q. Anything else? A. I think we checked the radiator to see if it was low. In fact, we did, and filled

the radiator and then checking for leaks in it because something had caused it to get hot at the time. Q. It had boiled over just a little while before you decided to inspect it, had it not? A. No, it hadn't boiled over. It just got hot. The gauge shot—the temperature was getting hot so we pulled it back into the yard to check to see what was the cause of it."

Miller testified that while Akridge and Grossenbach were working on the tractor he was "just standing by, and being there to help if I could, observing." He said that when he saw that Grossenbach was about ready to move the tractor he started to walk back to his trailer. It was his intention first to move his trailer in order to get it out of the line of travel of the tractor and thus to avoid the danger of a collision. He said he then intended to move the trailer into position for the loading of the tractor. Thereafter, he said, he intended "to get on my trailer, to direct him in driving the tractor on." However, Miller was struck down by the tractor after he had taken only "seven or eight steps" or a distance of only "fifteen or twenty feet" in the direction of his trailer.

Grossenbach's testimony was consistent with that of Akridge in all substantial respects. As to the matter of his employment by Weeshoff, he testified as follows: "Q. Your occupation classification with Weeshoff was not a Cat operator; is that correct? A. That is correct. Q. You were a mechanic? A. Right. Q. Whatever duties you were performing with that Cat was just by way of temporary operation during the course of repairs, or whatever; is that right? A. Correct."

### The Insurance Coverage

Harbor's policy insuring Weeshoff is in conventional form. Under Coverage A it provides the usual insurance against liability in the use of motor vehicles; under Coverage B it provides *the additional and more general insurance* in the form of a promise: "To pay on behalf of the assured all sums which the assured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, irrespective of whether such damages are imposed by law or assumed under contract."

Employers' policy insuring Owl also is in conventional form providing the insurance against liability *arising from the use of motor vehicles* as required by law. This policy contains a clause exempting the insurer from liability if the accident occurred in the course of the loading or unloading of an automobile on premises owned or controlled by the person or employer of the person against whom the claim was being made.

Since the accident in this case occurred on premises controlled by Weeshoff, appellant has argued that the quoted clause exempts it from liability. We reject this contention because the clause relied upon has been held to be contrary to public policy and void (*Glens Falls Ins. Co.* v. *Globe Indem. Co.,* 276 Cal.App.2d 643, 646-647 [81 Cal.Rptr. 28]); and because, at least for the purpose of this case, we may assume the correctness of respondent's contention that section 11580.1, subdivision (b) of the Insurance Code, effective as of November 23, 1970, and authorizing such an exemption, should not be given retroactive application. (*L. A. City Sch. Dist.* v. *Landier Inv. Co.,* 177 Cal.App.2d 744, 755 [2 Cal.Rptr. 662].)

Pacific's policy insuring Weeshoff provided insurance limited to coverage for liability arising from the use of automobiles. Neither party to this appeal has challenged the trial court's finding that the caterpillar tractor was not an automobile and the conclusion that there was no liability on the part of Pacific.

### The Applicable Law

In *International Business Machines Corp.* v. *Truck Ins. Exch., supra,* 2 Cal.3d 1026, 1032, the Supreme Court explained the injustice that results from an over-extension of the "use" concept to an innocent transporter where the shipper is the culpable party as follows: "Almost all of the cases presenting the issue of 'use' of the vehicle by the shipper involved disputes between two insurance companies, as does this case, and a holding that the shipper constitutes a 'user' of the vehicle generally results in a transfer of all or part of the ultimate liability from the insurer for the negligent entity to the insurer of an innocent entity. Such a ruling secures for the shipper an insurance rate disproportionately low relative to the hazards of his business and may ultimately tend to discourage the shipper from exerting due care in the maintenance of the premises. Moreover, the injured person in these cases is almost always an employee of the trucker, acting within the course of his employment, and thus entitled to workmen's compensation for his injuries as well as to his tort action against the negligent shipper. So far as we have discovered, the combination of injury to a third party and a possibly financially irresponsible shipper has occurred in only one reported case, *American Auto. Ins. Co.* v. *Transport Indem. Co.* (1962) 200 Cal.App.2d 543 [19 Cal.Rptr. 558]."

In *Entz* v. *Fidelity & Casualty Co., supra,* 64 Cal.2d 379, at page 383, it is stated that, "Where a policy provides for coverage during the loading or unloading of a vehicle, the terms 'loading' and 'unloading' must be given their plain and ordinary meaning." And at pages 385-386, the Supreme

Court declared as follows with respect to the required causal connection essential to constitute "use" of the insured vehicle in the course of loading or unloading cargo: "*Although the vehicle need not be, in the legal sense, a proximate cause of the injury, the events giving rise to the claim must arise out of, and be related to, its use.* [Citations.]" (Italics added.) The foregoing from *Entz* is quoted with approval in footnote 6 of the *IBM* decision, 2 Cal.3d at page 1031.

In *Truck Ins. Exch.* v. *Webb,* 256 Cal.App.2d 140, 145-146 [63 Cal. Rptr. 791], the law is stated as follows: "Although the word 'use' must be given an all-inclusive connotation, there must be a causal connection between the use and the injury. The automobile is so much a part of American life that there are few activities in which the 'use of an automobile' does not play a part somewhere in the chain of events. Clearly the parties to an automobile liability policy do not contemplate a general liability insurance contract. (See *Gray* v. *Zurich Ins. Co.,* 65 Cal.2d 263, 274 [54 Cal.Rptr. 105, 419 P.2d 168].)

"The test for determining the existence of the requisite causal connection has been expressed in varying language. It has been stated that the resulting injury must be a 'natural and reasonable incident or consequence of the use of the [automobile] for the purposes shown by the declarations, though not foreseen or expected. . . .' and that the injury cannot be said to arise out of the use of an automobile 'if it was directly caused by some independent act, or intervening cause wholly disassociated from, independent of and remote from the use of the [automobile].' (*Schmidt* v. *Utilities Ins. Co.,* 353 Mo. 213 [182 S.W.2d 181, 184, 154 A.L.R. 1088] [160 A.L.R. 1275]; 12 Couch on Insurance (2d ed.) § 45.56, p. 148.)"

The California rule is consistent with the test suggested by Professor Prosser in determining the existence of cause in fact in a negligence case, that is, whether the agency in question was a "material element and a substantial factor" in bringing about the injury. (Prosser on Torts (3d ed.) § 41, p. 244.)

We had occasion to apply the policy considerations enunciated in *IBM* in *Camay Drilling Co.* v. *Travelers Indem. Co., supra,* 12 Cal.App.3d 237, 240 (hg. den.). In referring to that Supreme Court decision we concluded:

"That decision enunciates a sensible limitation upon the proper application of the 'use' concept in determining the extent of insurance coverage for the permissive use of motor vehicles. *Its reasoning exposes the unrealistic and unjust effects of further extending this concept to the point where it operates to transfer liability from the negligent entity to the insurer for*

*the innocent entity—especially in cases in which the motor vehicle was only a peripheral, inactive or incidental factor.*" (Italics added.)

Our reasoning in *Camay* at page 242 developed other policy considerations which have always been, *sub silentio*, relevant factors in the interpretation of the "use" coverage of automobile policies: "No third party user of the highway was involved and the relationship between the injured party and his employer under the terms of the California Workmen's Compensation law or otherwise is not an issue. In such circumstance to require the non-negligent policyholder's insurance carrier to finance its employee's damage claim for the sole benefit of the negligent appellant's carrier would serve none of the beneficent dictates of public policy enunciated in *Continental Cas. Co.* v. *Phoenix Constr. Co.*, 46 Cal.2d 423, 434 [296 P.2d 801, 57 A.L.R.2d 914], and in *Wildman* v. *Government Employees' Ins. Co.*, 48 Cal.2d 31, 39-40 [307 P.2d 359]."

In *Argonaut Ins. Co.* v. *Transport Indem. Co., supra,* 6 Cal.3d 496, 507, the Supreme Court recognized that work preparatory to moving was not "loading." "No case has held that preparatory work by the owner of property to be moved or loaded, prior to the arrival of the truck onto the premises, constitutes part of the moving or loading process; and, under the rationale of *International Business Machines,* it would be improper to extend the concept of 'user' to include such preparatory work by the owner of the property to be moved or loaded."

*Appellant's Trailer Was Not Being Used at the Time of the Accident Which Occurred in the Course of a Movement of Weeshoff's Tractor for a Purpose Wholly Unrelated to the Loading of the Tractor.*

The decisions in *IBM, Entz* and all others of the recent decisions involving the issue of "use" in the loading and unloading of freight-carrying motor vehicles reach the common sense conclusion that unless the claim in question in some realistic sense "arises out of" or is "related to" the *use* of the insured vehicle in connection with the actual loading or unloading of cargo, the insurer of the vehicle is not liable.

As the landmark decision in *IBM* so clearly and forcefully points out, every dictate of equity and reason forbids the over-extension of the use concept to transfer liability "from the insurer for the negligent entity to the insurer of an innocent entity."

In the case at bench Miller was run over by Weeshoff's tractor while it was being operated by Weeshoff's employee during the course of a movement which had for its *sole* purpose the ascertainment of the cause of the

overheating of the tractor engine and the correction of that condition. This indisputable and controlling fact is established by the testimony of Miller and by the clear and consistent testimony of Weeshoff's employees, Akridge and Grossenbach.

The testimony of the same witnesses makes it clear beyond reasonable dispute that at the time of the accident appellant's trailer had not even been backed up to the dirt ramp in a position to permit the *commencement* of the loading of the tractor. Miller testified that *it was his intention to move his truck and trailer into position and then to board the trailer and participate in the loading process.*

But Miller was struck down by the tractor before he had taken more than six or seven steps in the direction of his truck. The evidence indicates that Miller was struck by the tractor at a point approximately 100 feet distant from the dirt ramp which Grossenbach had constructed for use in loading the tractor.

The uncontradicted evidence leaves no basis for any assertion that Miller directed, controlled or participated in the movement of the tractor during the digression taken for the indicated purpose wholly unrelated to the loading process. But even if he *had* participated in some manner in a movement of the tractor constituting no part of the loading process, it would not have involved any use of the truck and trailer.

Moreover, as the Supreme Court pointed out in *IBM* at page 1029, the determinative question is "not whether the accident occurred during the [loading], but, rather, whether the injury arose out of the use of the vehicle." Where, as here, there is no substantial dispute as to the operative facts, the question is one of law.

The truck and trailer insured by appellant in this case could hardly be regarded even as "a peripheral, inactive or incidental factor" in the accident which gave rise to Miller's claim. It was standing parked and had not even been moved into position for the loading. The active agents in this accident were Weeshoff's tractor and its driver, Weeshoff's employee.

In the circumstances of this case, Harbor, the insurer of Weeshoff, Grossenbach's employer, was only fulfilling its contractual duty when it undertook the defense of its insured in the case of Miller v. Weeshoff Construction Co. Obviously, a recovery by Miller therein would require findings by the trier of the facts *in that case* that Grossenbach's negligence was the proximate cause of the accident and that Miller was not chargeable with contributory negligence. If Harbor's insured *was* liable, then it would seem that the plainest dictates of equity and common sense would require

Harbor to provide the indemnity. If Weeshoff *was not* liable, then, of course, Harbor would have nothing to indemnify.

Most relevant here is the legally significant fact that the policy of Harbor is a *general liability insurance contract* which insures Weeshoff against *all claims* for *"damages because of bodily injury,"* whereas Employers' policy insuring Owl is *limited* to coverage for liability arising from the use of an automobile. Thus, the coverage of Harbor's policy and its contractual duty to defend its insured against Miller's claim are clear and unquestionable. (*Gray* v. *Zurich Insurance Co.,* 65 Cal.2d 263, 274-275 [54 Cal.Rptr. 104, 419 P.2d 168].)

The concurring and dissenting opinion betrays confusion in its suggestions that the trial court in this case was called upon to make findings of fact determining whether or not Weeshoff's employee was guilty of negligence which proximately caused Miller's injuries and whether or not Miller was guilty of contributory negligence. Those issues were issues tendered for trial in Miller v. Weeshoff and *not* in the instant case.

The ultimate issue of *fact* presented to the trial court in the case at bench, stated substantially in the words of *IBM* and *Entz,* was simply this: Did "the events giving rise to Miller's claim arise out of" and were they "related to" the "use" of Owl's truck and trailer? The uncontradicted evidence reported in the instant record is such as to require a negative answer to this question.

The determinative issue of *law* presented to the court below was whether or not Owl's vehicle was being "used" at the time of the accident within the concept of "use" as defined and limited in *IBM* and the other applicable California decisions. Again on the present record, a negative answer is unavoidable.

The judgment is reversed.

Compton, J., concurred.

**ROTH, P. J.**—I concur and dissent.

I would reverse to permit the trial court to make proper findings within its own discretion on all issues. The majority concede that no findings have been made on the subject of negligence or contributory negligence and usurp the trial court's function when they direct it to find negligence on the part of Harbor's insured. Further, the majority assume that the accident was no part of a loading operation. If it was, then on the law

concededly applicable at bench (*Glens Falls Ins. Co.* v. *Globe Indem. Co.*, 276 Cal.App.2d 643, 646-647 [81 Cal.Rptr. 28]), the question of whether it was part of a loading operation would be decisive of the case.

That the facts stipulated by the parties and adopted by the findings of the trial court form an inadequate basis for decision is demonstrated by the majority opinion which augments the record with the depositions of Miller, Grossenbach, and the latter's supervisor Akridge. Viewed in terms of all the evidence, whether or not the caterpillar's movement constituted a part of the loading procedure and whether or not Miller either directed or participated in the movements of the caterpillar, and whether Weeshoff's employees may or may not have been proximately negligent, or whether Miller may or may not have been contributorily negligent, should appear as findings which the trial court should have but did not make. There are important conflicts in the facts which the trial court did not resolve and there is no finding which fixes negligence with specificity.

The fact is that a ramp was built and apparently completed to load the tractor. The stipulated facts do not nor do the depositions show specifically whether Miller participated in building the ramp. The depositions of Harbor employees indicate that they did the work to prepare the ramp. However, the stipulated facts state that Miller gave ". . . whatever assistance he could . . ." in building the ramp and washing the engine and that when he had ". . . overheard . . . that the caterpillar was . . . to be loaded, he started walking toward the Owl trailer. [T]hereafter . . . the tractor came into contact with the body of . . . Miller, . . ."

Miller stated in his deposition that he walked back to his trailer "To get on my trailer, to direct him in driving the tractor on." Apparently, the tractor had to make a turn before it could go the final distance to complete the loading thereof on the trailer, and Miller intended to guide the tractor to its resting place on the trailer. Akridge stated that he and Grossenbach had been washing the tractor when he got off, and having finished the job, he ". . . told LeRoy *to load the Cat* and got down and went to turn the water off." (Italics added.) At another point, Akridge was asked whether he had testified that he had ". . . ordered LeRoy to move that Cat at the time he did so . . . and Akridge's answer was "I told him *to go ahead and load the Cat,* yes." (Italics added.) Akridge also testified as to the ordinary loading operation in stating, as to Miller's role that it was "ordinarily the driver of the truck" who directs the tractor onto the truck. It would seem fairly clear from Akridge's deposition alone, if not Miller's and Grossenbach's, that the tractor ran over Miller while it was being backed onto the loading ramp, and it may be a fair inference that Miller was proceeding to the truck in order to direct the loading process. Akridge, it might be

parenthetically noted, also opined that the accident was due to Miller's negligence.

The majority concede in effect that the doctrine of *Glens Falls Ins. Co.* v. *Globe Indem. Co.,* 276 Cal.App.2d 643, 646-647, *supra,* does apply to the facts at bench, that the amendment of section 11580.1, subdivision (b) of the Insurance Code, effective as of November 23, 1970, has no retroactive application. (*L. A. City Sch. Dist.* v. *Landier Inv. Co.,* 177 Cal.App. 2d 744, 755 [2 Cal.Rptr. 662].) If the court finds as a fact that Miller was participating in loading operations and if *Glens Falls* applies, as the majority concede, then it would make no difference whether Miller, insured by Owl, was negligent or whether Weeshoff's employees, insured by Harbor, were negligent. Under *Glens Falls,* Owl and its insurer Employer's would be responsible.

Reviewing this evidence, it is clear that the trial court had before it ample evidence upon which to frame specific findings relative to the entire loading process: as to Miller's involvement therein, whether it was a loading process and if not, whose negligence was the proximate cause of the injuries to Miller. The confusion noted by the majority on the nature of the required findings is, in Milton's words, "confusion worse confounded"*: findings, I repeat, should have been entered *relative to the entire loading process,* and in the detail suggested. A thorough disposition of this controversy demands no less. It should not be, and it is not, incumbent upon this court to sift through evidentiary material in order to determine whether the injury occurred in or independently of the loading process, and what the supposedly innocent party's activity had been in that process. The trial court failed to find on the critical issues pointed out above. This court should not make them.

I therefore concur in the reversal but I would return the case to the trial court with directions to make specific findings required as indicated in the foregoing and enter judgment accordingly.

A petition for a rehearing was denied July 28, 1972, and respondent's petition for a hearing by the Supreme Court was denied August 23, 1972. Mosk, J., and Sullivan, J., were of the opinion that the petition should be granted.

---

*Paradise Lost, Book II, Line 995.