[L.A. No. 29884. In Bank. Jan. 25, 1972.]

ARGONAUT INSURANCE COMPANY, Plaintiff and Appellant, v. TRANSPORT INDEMNITY COMPANY et al., Defendants and Respondents.

498

## Counsel

Garibaldi & Lane, Walter M. Sharman and Abe Mutchnik for Plaintiff and Appellant.

Hagenbaugh, Murphy & Davies, Sigurd E. Murphy, Ellis J. Horvitz, Schell & Delamer and Eugene D. Hillman for Defendants and Respondents.

## Opinion

**McCOMB, J.**—In this case, involving the liability of three insurers whose policies provided concurrent coverage for a certain accident, a hearing was granted by this court, after decision by the Court of Appeal, Second Appellate District, Division Two, for the purpose of giving further study to the problems presented. After such study, we have concluded that the opinion of the Court of Appeal, prepared by Mr. Justice Compton, in most respects correctly treats and disposes of the issues involved; and, with certain changes, it is adopted as and for the opinion of this court. Such

opinion (with appropriate deletions and additions as indicated) is as follows:[1]

Argonaut Insurance Company sought declaratory relief delineating the respective rights and obligations of three insurance companies whose policies provided concurrent coverage for an accident which occurred during the unloading of a truck and which resulted in injuries to the driver. The trial court prorated liability between plaintiff Argonaut and defendant Transport Indemnity Company. Defendant Balboa Insurance Company was held liable for excess coverage only in the event that Argonaut's and Transport's coverage be deemed invalid and noncollectible. Argonaut has appealed.

The case was submitted below upon an agreed statement of facts with attached exhibits which included copies of the pertinent insurance policies.

Said agreed statement is as follows:

"On December 21, 1964, RICHARD NANCE was an employee of WILLIG FREIGHT LINES and acting in the scope of his employment as a truck driver when he sustained an injury giving rise to the litigation referred to herein.

"STEELFORM CONTRACTING COMPANY was engaged in a construction project for a shopping center in the vicinity of Firestone Boulevard and Woodruff Avenue, in Los Angeles County. STEELFORM engaged WILLIG FREIGHT LINES to transport a quantity of steel pan shaped forms from Steelform's plant in San Leandro, California, to the jobsite in Downey. Sometime prior to December 21, 1964, Willig's tractor and semi-trailer unit was brought to Steelform's plant in San Leandro and there loaded with pan shaped forms. Subsequently, an employee of Willig brought the tractor and loaded semi-trailer to Willig's Los Angeles yard. There, on the day of the accident Nance, in response to his employer's instructions hooked another of his employer's tractor units to the semi-trailer and took it to the jobsite.

"At the jobsite the tractor and semi-trailer were located on the premises of Steelform, and KENNETH B. CURRIER, an employee of Steelform, was directed to unload the semi-trailer. In the process of unloading the semi-trailer Currier was furnished by his employer with a forklift which Steelform had rented from, and which was owned by, ASSOCIATED TRUCK

---

[1]Brackets together, in this manner [ ], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A. G.*, 3 Cal.3d 434, 440, fn. 1 [91 Cal.Rptr. 6, 476 P.2d 406].)

RENTALS, INC. Nance was assisting in the process of unloading when a portion of the load fell from the semi-trailer onto Nance and injured him.

"WILLIG FREIGHT LINES was on the date of the accident a highway common carrier and a petroleum irregular route carrier, operating under permits issued by the Public Utilities Commission of the State of California and the United States Interstate Commerce Commission.

"As a result of the accident and his injuries Nance has brought an action for damages in the Superior Court in Los Angeles County. The action bears #SE C 3171-C and is entitled RICHARD NANCE, plaintiff v. STEEL-FORM CONTRACTING COMPANY (and various fictitiously named defendants). In plaintiff's complaint, . . . plaintiff Nance refers to the tractor and semi-trailer as a 'flat bed truck,' and alleges he sustained damages as a result of negligence of defendants in (1) loading the truck; (2) inspecting, testing, and fastening the load on the truck; and (3) operating the forklift while unloading the truck.

"INSURANCE POLICIES

"At the time of the injury in question there were in effect four liability insurance policies:

"1. A policy issued by ARGONAUT INSURANCE COMPANY to STEELFORM as named insured.

"2. Two policies issued by TRANSPORT INDEMNITY COMPANY to WILLIG as named insured.

"3. A policy issued by BALBOA INSURANCE COMPANY to ASSOCIATED TRUCK RENTALS as named insured."

The following additional pertinent facts are disclosed by the record and exhibits.

Both Transport's policy No. 4100551 and Argonaut's policy contained "excess coverage" or "other insurance" clauses, which if given full application would result in no coverage whatsoever. Transport's policy No. 4100551-X also contained such an excess coverage clause, the operative effect of which was to limit its coverage to any excess liability owed after payment on all other applicable policies.

Balboa's policy contained an "escape clause" which if valid, as the trial court found, served to insulate Balboa from any liability so long as Transport's and Argonaut's policies were valid and collectible.

The conclusion of the trial court was that "Transport has coverage for Willig, Currier and Steelform to the extent of $100,000.00; Argonaut has

coverage for Steelform, Currier and Willig to the sum of $500,000.00; said companies shall prorate liability in the proportion their coverage bears, to wit, 1/6 Transport, 5/6 Argonaut, to the total sum of $600,000.00. Liability of said insureds in excess of $600,000.00 is supplied by Transport under its specific excess policy No. 4100551-X."

Plaintiff seeks reversal of the judgment on three grounds: First, plaintiff asserts that the coverage of defendant Transport should be declared to be primary for the reason that its policies contained "P.U.C." endorsements. Secondly, plaintiff urges that the "other insurance" clause in Balboa's policy did not represent a valid "escape clause." Thirdly, plaintiff complains of the trial court's failure to specify in the judgment the specific obligations of the three insurers in respect to the duty to defend.

█ █ It is well settled that where no extrinsic evidence is introduced at trial to aid in the construction of a contract, such construction presents a question of law. (*U.S. Leasing Corp.* v. *DuPont,* 69 Cal.2d 275, 284 [70 Cal.Rptr. 393, 444 P.2d 65]; *Continental Cas. Co.* v. *Hartford Acc. & Indem. Co.,* 213 Cal.App.2d 78 [28 Cal.Rptr. 606].) Accordingly, on review of the judgment we are free to make independent determination of the policies' meanings as deduced from the pertinent provisions of the policies. (*Continental Cas. Co.* v. *Phoenix Constr. Co.,* 46 Cal.2d 423, 430 [296 P.2d 801, 57 A.L.R.2d 914].)

As a highway common carrier and petroleum irregular route carrier, Willig was required by state law to obtain minimum liability insurance as a precondition to doing business in California.

Section 3631 of the Public Utilities Code instructs the Public Utilities Commission "in granting permits pursuant to this chapter, [to] require the highway carrier to procure, and continue in effect during the life of the permit, adequate protection . . . against liability imposed by law upon the highway carrier for the payment of damages for personal bodily injuries, including death resulting therefrom . . . ." The P.U.C. retains the authority to deny its certificate of convenience and necessity to any highway carrier who fails to abide by its rules and regulations concerning the procurement of liability insurance. (See Stats. 1935, ch. 223, p. 879; Stats. 1951, ch. 764, p. 2116; *C. W. Carlstrom,* 40 C.R.C. 175; §§ 1061, 1062, 1063 of the Pub. Util. Code.)

In exercising its jurisdiction the P.U.C. "by general order or otherwise, may prescribe rules applicable to any and all highway common carriers, cement carriers and petroleum irregular route carriers." (§ 1062 of the Pub. Util. Code.)

The P.U.C. regulations concerning liability insurance are contained in

P.U.C. General Order No. 100B, effective July 1, 1961, and supplemental modifications of that order.

P.U.C. Endorsement No. 111, which was attached to Transport's policy, brought said policy into compliance with General Order No. 100B. Endorsement No. 111 extended Transport's coverage of Willig to the required $100,000 minimum for bodily injury to one person.

Endorsement No. 111 reads in pertinent part: ". . . [Transport] hereby agrees to pay, within the limits of liability hereinafter provided, [$100,000 per person] any final judgment rendered against the insured for bodily injury to or death of any person, or loss of or damage to property of others (excluding injury to or death of the insured's employees while engaged in the course of their employment, . . .) resulting from the operation, maintenance, or use of motor vehicles for which a certificate of public convenience and necessity or permit is required or has been issued to the insured by the Public Utilities Commission of the State of California, regardless of whether such motor vehicles are specifically described in the policy or not.

"Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement, by the insured, shall relieve [Transport] from liability hereunder or from the payment of any such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and [Transport], and *the insured agrees to reimburse [Transport]* for any payment made by [Transport] on account of any accident, claim, or suit involving a breach of the terms of the policy, and *for any payment that [Transport] would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.*" (Italics added.)

The policy as so endorsed does not lend itself to an interpretation that the carrier intended to establish its coverage as primary vis-à-vis other available coverage.

█ An analysis of the language of General Order No. 100B, the progenitor of Endorsement 111, in the light of the reported P.U.C. investigations, orders and decisions available to us, compels the conclusion that neither the Legislature by enactment of section 3631 of the Public Utilities Code nor the P.U.C. by promulgation of General Order No. 100B intended to dictate which of two otherwise equally applicable insurance policies should be designated as primary.

■ The legislative purposes of section 3631 and General Order No. 100B are "to protect the public against reckless operation of such vehicles by financially irresponsible owners, and to provide a means of recovery for those injured in their person or property by such operation." (7 Appleman, Insurance Law and Practice, § 4463, p. 510; *Paul Masson Co.* v. *Colonial Ins. Co.*, 14 Cal.App.3d 265 [92 Cal.Rptr. 463]; *Boulter* v. *Commercial Standard Ins. Co.*, 175 F.2d 763, 767.)

A P.U.C. investigation which led to the amendment of General Order 100B and the imposition of the $100,000 minimum concluded ". . . *that the public health and safety require that the minimum requirements for protection of the public* against loss and damage due to injury or death of persons and damage to property inflicted by for-hire carriers of petroleum products . . ., should be [$100,000.00 for bodily injuries to or death of one person]." (Italics added.) (58 Cal. P.U.C. 711, 712.)

The P.U.C.'s opinion which established General Order No. 100B declares: "The policy of the Legislature is clear that vehicles should not be on the highway without insurance. The paramount right of the public to protection must, at all times, be considered by the Commission." (58 Cal. P.U.C. 706, 707.)

However protective of a third party claimant are such pronouncements, there is nothing in General Order No. 100B to indicate that such coverage is to be primary over otherwise equally applicable insurance. ■ To the contrary General Order No. 100B seems to indicate that as long as the public is secure in the prescribed minimum coverage the insured and his insurer and by implication the insurer and other insurers are free to adjust and limit their various roles by contract. Thus, Endorsement No. 111 provides that "all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the [insurance] Company. . . ."

Finally, it is significant to note that factors considered in the periodic investigations conducted by the P.U.C. to determine the minimum level of required insurance did not include the necessity of imposing primary liability for applicable occurrences on the P.U.C. endorsed policies. (See: 58 Cal. P.U.C. 706; 58 Cal. P.U.C. 711; 55 Cal. P.U.C. 731, 732-733.) Nor do we think that such a consideration would be an appropriate factor. Given available, adequate coverage equal to the P.U.C. minimums, there is no apparent common sense reason to suppose that the attainment of the P.U.C.'s general objective would be enhanced by imposing primary coverage on one insurance policy over another.

■ "When, as we have assumed here, dual coverage is provided for

the same risk, public policy plays a minor role in the determination of which coverage is primary, for to the public it makes little difference which of two insurers is ultimately held responsible for a particular loss." (*Pacific Indem. Co.* v. *Liberty Mut. Ins. Co.,* 269 Cal.App.2d 793, 796 [75 Cal. Rptr. 559].)

The power of the P.U.C. to exercise the police powers of the state for the protection of the public by requiring highway carriers to carry minimum public liability insurance may indeed include the ability to predetermine which policy's coverage is, in a given occurrence, to be primary. The P.U.C., however, has not yet chosen to do so.

Plaintiff relied in the trial court and relies here on *Travelers Indem. Co.* v. *Colonial Ins. Co.,* 242 Cal.App.2d 227 [51 Cal.Rptr. 724]. It is true that that case appears to reach the conclusion advanced by plaintiff concerning the effect of a P.U.C. endorsement. [ ] [Insofar as it does so, however, it is hereby disapproved.

Attached to one of the policies involved in *Travelers* was a P.U.C. endorsement which was apparently identical to Endorsement 111 attached to the Transport policy. In *Travelers,* as here, the contention was made that such endorsement overcame the "other insurance" or excess clause of the policy to which it was attached; and the Court of Appeal stated in *Travelers,* at page 241 of 242 Cal.App.2d: "At oral argument, Travelers urged that the coverage was primary because the provisions of the endorsement were unconditional, thereby in effect 'wiping out' the other insurance clause quoted above. We think this argument has merit. The endorsement explicitly states that 'no condition, provision, stipulation, or limitation contained in the policy . . . shall relieve the Company from liability hereunder. . . .' "

In this court's opinion, however, the P.U.C. endorsement does not nullify the excess insurance clause. As hereinabove indicated, the purpose of the endorsement requirement is to protect the public and not to determine which of two insurers should be held ultimately liable. The endorsement language, considered as a whole, suggests an intent to protect injured persons by precluding defenses based on the insured's failure to cooperate or breach of condition, while permitting the insurer in such instances to obtain reimbursement from the insured. The language of the endorsement shows no intent to make a policy to which it is attached primary over any other insurance in spite of a valid excess insurance clause, and it would be unreasonable to give it such a meaning and effect, particularly in view of the fact that under the endorsement the insured is required to reimburse the insurer for any payment that the latter would not have been obligated to make under the provisions of the policy except for the agreement contained in the endorsement.

■ The principle that insurance contracts must be construed against the insurer is inapplicable here. That principle serves the goal of protecting the reasonable expectations of the insured, but in the present situation the issue of the effect of the P.U.C. endorsement on the excess insurance clause concerns only the respective liabilities of two insurers.]

Carrying Argonaut's contention and the result reached in *Travelers* to a logical extreme would have the effect of saddling the trucker with primary liability in all cases simply because the trucking industry is more highly regulated than the business of the user or shipper. Except for its use of the highways there is nothing so unique about a truck that should in logic require this extra responsibility where the incident which is the focal point of liability is unrelated to the use of the highways.

We now direct attention to the proration adopted by the trial court. [ ]

■ [As pointed out by this court in *International Business Machines Corp.* v. *Truck Ins. Exch.* 2 Cal.3d 1026, 1029 (2) [89 Cal.Rptr. 615, 474 P.2d 431], the "use" of a vehicle includes its loading and unloading. (See *Shippers Dev. Co.* v. *General Ins. Co.*, 274 Cal.App.2d 661, 666 [3] [79 Cal.Rptr. 388].) Willig's vehicle was therefore clearly being "used" by those engaged in the unloading process. ■ Steelform (through Currier, its employee, with the assistance of Nance, Willig's employee) was actually doing the unloading, employing a forklift in the process. Since Steelform's act in so using the truck was with Willig's permission, Transport's policies give coverage not only to Willig, as the named insured, but also to Steelform and Currier as additional insureds. (See *American Auto. Ins. Co.* v. *Transport Indem. Co.*, 200 Cal.App.2d 543 [19 Cal.Rptr. 558].)

In *International Business Machines,* unlike the situation here, the shipper was not actively engaged in either loading or unloading the trucker's truck. We there held that the mere maintenance of premises used for loading or unloading is not in itself a sufficient basis upon which to find the shipper a user of a truck being loaded or unloaded. As pointed out above, however, in the present case it is conceded that Steelform was unloading the truck. As a result, it was "using" the truck. *International Business Machines* is therefore factually distinguishable.

In *Camay Drilling Co.* v. *Travelers Indem. Co.*, 12 Cal.App.3d 237 [90 Cal.Rptr. 710], the Court of Appeal refused to hold the insurer for a nonnegligent truck owner, which had been employed to move an oil derrick, liable for injuries sustained as the result of negligence by Camay, the owner of the derrick, in preparing it for moving. Camay sought a declaration that it was covered under the truck owner's comprehensive liability

policy as a "user" of the trucks, which were being used solely as movable winches to drag the derrick. Camay's negligence took place while it was *preparing* the derrick for moving, before the trucks were even brought onto the property. ▪ No case has held that preparatory work by the owner of property to be moved or loaded, prior to the arrival of the truck onto the premises, constitutes part of the moving or loading process; and, under the rationale of *International Business Machines,* it would be improper to extend the concept of "user" to include such preparatory work by the owner of the property to be moved or loaded. Furthermore, the mover (truck owner) was an independent contractor and had complete control and supervision of the trucks. Camay did not participate in, or supervise, the moving and, indeed, had no right to do so.

In the present case, on the other hand, the ones seeking coverage under the trucker's policy as "users" of the truck were unquestionably using it under accepted standards for determining if use was being made, and were doing so with the permission of the trucker.

The Argonaut policy is a comprehensive general liability policy and by its terms gives coverage to Steelform (the named insured) and Currier (Steelform's employee) in the use of the tractor and semi-trailer and the forklift as nonowned automobiles.[2] They therefore have coverage under both the Argonaut policy and Transport's policies. As hereinabove indicated, Transport's policy 4100551 and Argonaut's policy contain "excess coverage" or "other insurance" clauses. ▪ When two or more applicable policies contain such clauses, both liability and the costs of defense should ordinarily be prorated according to the amount of coverage afforded. (*General Ins. Co.* v. *Truck Ins. Exch.,* 242 Cal.App.2d 419, 424-425 [6a] [51 Cal.Rptr. 462]; *American Motorists Ins. Co.* v. *Underwriters at Lloyd's London,* 224 Cal.App.2d 81, 87 [36 Cal.Rptr. 297]; see *Home Indemnity Co.* v. *Mission Ins. Co.,* 251 Cal.App.2d 942, 963-964 [60 Cal.Rptr. 544].) Under the circumstances, the trial court properly made a proration of one-sixth to Transport and five-sixths to Argonaut to the total sum of $600,000, and determined that liability of the insureds in excess of $600,000 be supplied by Transport under its specific excess policy 4100551-X.[3]]

---

[2]Although, as found by the trial court, Willig also has coverage under the Argonaut policy, this fact is not material, since Nance has not named Willig as a defendant in his action.

[3]It is of interest to note that in 1970 section 11580.9 was added to the Insurance Code, providing in part: "(c) Where two or more policies are applicable to the same loss arising out of the loading or unloading of a motor vehicle, and one or more of the policies is issued to the owner, tenant, or lessee of the premises on which the loading or unloading occurs, it shall be conclusively presumed that the insurance afforded by the policy covering the motor vehicle shall not be primary,

Plaintiff next contends that the trial court erroneously found a provision in defendant Balboa's policy to be a proper escape clause which by its terms reduced Balboa's coverage to a secondary status.

The provision in question, Endorsement 20, provides in relevant part: "The insurance afforded an insured other than the named insured, or his agent or employee acting in the scope of such agency or employment, is not applicable if there is available to the insured any other valid and collectible automobile liability insurance, either primary or excess applicable to the same loss covering the insured as a named insured or as an agent or employee of a named insured . . .; and in such event the two or more policies shall not be construed as providing cumulative or concurrent coverage, and only that policy which covers the liability of such person as a named insured, or as an employee or agent of a named insured, or as an insured, is applicable."

■ Such escape clauses are generally disfavored in the law. (*Peerless Cas. Co.* v. *Continental Cas. Co.,* 144 Cal.App.2d 617, 623 [301 P.2d 602].) However, "[t]he insurance company is entitled to write a policy which limits its coverage to certain persons unless the law expressly provides otherwise . . . and the limitations in the provisions of the policy must be respected." (*Pacific Indem. Co.* v. *Truck Ins. Exch.,* 269 Cal. App.2d 420, 428-429 [74 Cal.Rptr. 793].)

■ In the instant case defendant Balboa wrote its "escape clause" so as to bring it directly under the language of section 11580.1, subdivision (f) of the Insurance Code as it was in effect at the time this policy was issued.[4] (See Stats. 1963, ch. 1259, § 1, pp. 2780-2781.) This simply permitted the carrier for the bailor of the forklift to shift primary liability to the carrier for the bailee.

---

notwithstanding anything to the contrary in any endorsement required by law to be placed on such policy, but shall be excess over all other valid and collectible insurance applicable to the same loss with limits at least equal to the financial responsibility requirements specified in Section 16059 of the Vehicle Code; and, in such event, the two or more policies shall not be construed as providing concurrent coverage, and only the insurance afforded by the policy or policies covering the premises on which the loading or unloading occurs shall be primary and such policy or policies shall cover as an additional insured with respect to the loading or unloading operations all employees of such owner, tenant, or lessee while acting in the course and scope of their employment." Section 11580.9, however, was not in effect at the time of the accident herein.

[4]Section 11580.1, subdivision (f) was added to the Insurance Code in 1963 to read in pertinent part: "[A policy of liability insurance covering liability arising out of the ownership, maintenance or use of any motor vehicle] may contain a provision that the insurance coverage applicable to such motor vehicles afforded a person other than the named insured or his agent or employee shall not be applicable . . . to the same loss covering such person as a named insured or as an agent or employee

██ Plaintiff asserts that even if Balboa's Endorsement 20 otherwise qualifies as a valid escape clause, it is inapplicable here for the reason that a forklift is not an automobile as defined by the policy and the Vehicle Code. We do not agree. The trial court expressly found the forklift to be "an automobile of the commercial type." The forklift was registered with the Department of Motor Vehicles and was operated upon public highways within a radius of five miles. Forklifts have consistently been held to be automobiles under policies similar to those at issue here. (*Pacific Employ-* *ers Ins. Co.* v. *Maryland Casualty Co.,* 65 Cal.2d 318, 324 [54 Cal.Rptr. 385, 419 P.2d 641]; *Travelers Indem. Co.* v. *Colonial Ins. Co., supra.*)

Finally, it is true, as plaintiff points out, that the trial court apparently failed to prescribe in its judgment how the [ ] insurers should provide for the costs of the defense of Steelform [ ] and Currier in the Nance action. [ ] [The trial court, however, made a conclusion of law, as follows: "Transport and Argonaut owe their respective insureds a defense as to said claim of Nance and shall bear the costs thereof: 1/6 to Transport, 5/6 to Argonaut." In view of our holding herein, the judgment is modified to prorate the costs of defense in the proportions stated in the trial court's conclusions of law.]

The judgment as modified is affirmed.

Tobriner, J., Mosk, J., and Burke, J., concurred.

**SULLIVAN, J.**—I dissent.

The majority essentially hold that the liability for the injuries to Nance, the truck driver, and for the costs of defense in resisting his claim should be prorated as follows: one-sixth to Transport, the insurer of Willig, the common carrier, and five-sixths to Argonaut, the insurer of Steelform, the construction company. To reach this result, the majority conclude that the so-called P.U.C. endorsement to the Transport policy has no effect upon its "excess coverage" or "other insurance" clause. Since the policies of both Argonaut and Transport have effective "other insurance" clauses proration is required. I must respectfully disagree with these views.

The nub of the problem is, of course, the continued vitality of Transport's "other insurance" clause notwithstanding the P.U.C. endorsement. Willig, the insured, was required to have such an endorsement on its policy

---

of a named insured under a policy with limits at least equal to the financial responsibility requirements specified in Section 16059 of the Vehicle Code; and in such event, the two or more policies shall not be construed as providing cumulative or concurrent coverage and only that policy which covers the liability of such person as a named insured, or as an agent or employee of a named insured, shall apply . . . ."

in order to obtain from the Public Utilities Commission (P.U.C.) a permit to operate as a highway common carrier and petroleum irregular route carrier. (Pub. Util. Code, §§ 3631, 1062; P.U.C. General Order No. 100B.) Thus P.U.C. Endorsement No. 111 attached to the Transport policy increased the coverage to the required minimum of $100,000 for bodily injury or death "resulting from the *operation, maintenance,* or *use* of *motor vehicles for which a certificate of public convenience and necessity or permit* is required or has been issued to the insured by the Public Utilities Commission of the State of California, regardless of whether such motor vehicles are specifically described in the policy or not." (Italics added.) So far as is pertinent to the present discussion, the endorsement also stated, "Within the limits of liability hereinafter provided it is further understood and agreed that *no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement, by the insured, shall relieve* [Transport] *from liability hereunder* or from the payment of any such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and [Transport] . . . ." (Italics added.)

Argonaut's crucial contention on appeal is that under the P.U.C. endorsement Transport became the primary insurer up to $100,000. The majority have rejected this contention because they can find nothing in General Order No. 100B or elsewhere to indicate that the coverage required by the P.U.C. is primary over equally applicable insurance or that the P.U.C. ever intended so to dictate. On the contrary, declare the majority, the real purpose behind the P.U.C.'s order is the protection of the public from financially irresponsible common carriers which would not be enhanced by imposing primary coverage on one insurance policy over another.

This rationale is all beside the point. To say that the P.U.C.'s objective was to protect the public by providing for adequate coverage does not shed any light at all on the question whether the required coverage is "primary" or "excess." To argue that nothing indicates that the P.U.C. intended "to dictate" which of several applicable policies should be designated primary is utterly without significance. The P.U.C.'s province is regulation of common carriers, not of insurance companies. It is of no concern to the P.U.C. if its regulatory mission affects conflicting coverages among insurers. In most controversies over "other insurance" clauses the embattled parties are not subject to the jurisdiction of the P.U.C. at all. There is simply no reason to expect that the P.U.C. would have had occasion to consider regulations for this problem; the fact that the majority

have failed to discern any intention on the P.U.C.'s part to do so is meaningless.

Our task, then, is to interpret the Transport policy together with its P.U.C. endorsement as a contractual whole. (Civ. Code, § 1641; Rest., Contracts, § 235(c).) Our inquiry must be directed to the legal effect of the required endorsement on the provisions of the original policy with which the P.U.C. had no concern. This is a problem of construction of contracts, for even though the endorsement was required by law, such instrument should be interpreted as a contract, not as a statute. (*Ruffino* v. *Queen Insurance Co.* (1934) 138 Cal.App. 528, 537-538 [33 P.2d 26, 883].) I agree with the majority that on the present record the construction of the policy and its endorsement is a question of law. (*U.S. Leasing Corp.* v. *DuPont* (1968) 69 Cal.2d 275, 284 [70 Cal.Rptr. 393, 444 P.2d 65].) But, in determining such questions of law, we must focus on the words used in the endorsement and thus reach a conclusion as to its legal effect. (See Rest., Contracts, § 230.)

Generally, an endorsement affects only the policy provisions relevant to the reason for the endorsement. (*Westphalen* v. *Bankers Indemnity Co.* (9th Cir. 1943) 134 F.2d 745, 747.) "[N]evertheless if there is conflict in meaning between an endorsement and the body of the policy, the endorsement controls." (*Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 431 [296 P.2d 801, 57 A.L.R.2d 914].) As pointed out above, the P.U.C. endorsement attached here specifically provides that "no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon . . . shall relieve [Transport] from liability hereunder . . . ." The "excess" clause in the standard agreement is clearly a "condition" or "provision" which might, in the absence of the endorsement, relieve Transport from liability. The above language of the endorsement is plain and forthright. It speaks in broad, unconditional and absolute terms: "*no* condition [or] provision . . . in the policy . . . *shall relieve* [Transport] from liability . . . ." (Italics added.) The endorsement thus has the effect of superseding and nullifying the "excess" clause which might otherwise relieve Transport from liability. By so doing, it transformed the coverage into "primary" coverage. Transport of course was fully aware that such an endorsement was required to be affixed to any automobile policy of Willig as a condition to the issuance of a P.U.C. permit and therefore must be presumed to have assented to the sweeping effect of its language.

The majority voice a twofold complaint about such an interpretation of the endorsement. First they state that it "would have the effect of saddling the trucker with primary liability in all cases simply because the trucking

industry is more highly regulated than the business of the user or shipper." (Majority opn., *ante,* p. 506.) The plaint answers itself. I suggest that is precisely the point. It is fully consistent with the purposes of regulating common carriers to insist they bear a greater financial responsibility than the user or the shipper because inherent in their business is a greater risk of negligence. Second, the majority argue that "[e]xcept for its use of the highways there is nothing so unique about a truck that should in logic require this extra responsibility where the incident which is the focal point of liability is unrelated to the use of the highways." (*Id.*) The majority shut their eyes to realities. There is something very unique about Willig's truck. It is the truck of a common carrier. And it is unrealistic to say that it no longer has the characteristics of a common carrier vehicle when it is stopped for the purpose of picking up or delivering its freight. This is of the very essence of the activities of a common carrier. Indeed, such a carrier has greater opportunity to cause injuries than does a private vehicle.

In other words, the majority seems to be of the view that we should refrain from finding that Transport's policy was primary because Willig's truck was only tangentially involved in the accident causing Nance's injuries. To take this view is to ignore the ample precedent of this court and of the Courts of Appeal. There is in the eyes of the law nothing tangential about the involvement of Willig's truck or the coverage of the policy purchased by Willig from Transport. It is beyond dispute that the policy is just as operative under the facts before us as it would have been if Steelform's employee, as a permissive user, had caused the injuries by negligently backing the truck into the loading dock. The policy covers loading and unloading of the trucks as well as their operation upon the highways. (See *International Business Machines Corp.* v. *Truck Ins. Exch.* (1970) 2 Cal.3d 1026, 1029 [89 Cal.Rptr. 615, 474 P.2d 431]; *Continental Cas. Co.* v. *Zurich Ins. Co.* (1961) 57 Cal.2d 27, 33 [17 Cal.Rptr. 12, 366 P.2d 455].) Steelform's employee was a permissive user of the truck, even while merely participating in its unloading, and such use brings the policy fully into operation. (See Veh. Code, § 16451; *Wildman* v. *Government Employees' Ins. Co.* (1957) 48 Cal.2d 31, 39-40 [307 P.2d 359].) Once the policy applies to the incident, the operation of the endorsement makes it primary coverage.

It is not our province to vary the terms of insurance contracts in accord with our view of P.U.C. policy goals, but rather to interpret the terms of the contracts as written in compliance with P.U.C. orders.

I would reverse the judgment and remand the cause to the trial court

with directions to enter judgment in accordance with the views expressed in this opinion.

Wright, C. J., and Peters, J., concurred.