[Civ. No. 1466. Fifth Dist. June 5, 1972.]

CAL-FARM INSURANCE COMPANIES, Plaintiff and Appellant, v. FIREMAN'S FUND AMERICAN INSURANCE COMPANIES, Defendant and Respondent.

1064

## COUNSEL

R. W. Levy for Plaintiff and Appellant.

Stammer, McKnight, Barnum & Bailey and Galen McKnight for Defendant and Respondent.

## OPINION

**BROWN (G. A.), J.**—This is a controversy between two liability insurance companies regarding their respective obligations to pay an agreed $75,000 in damages to an injured third party and defense costs. We agree with the trial judge that Fireman's Fund should win the argument.

Cal-Farm Insurance Companies, a corporation (referred to as "Cal-Farm") acknowledges that its policy covers the defendants in the personal injury suit. It assumed defense of the third party personal injury suit on behalf of all the defendants. Fireman's Fund Insurance Company, a corporation, a member of Fireman's Fund American Insurance Companies, a corporation (referred to as "Fireman's"), refused to participate. Cal-Farm settled the third party suit for $75,000. It also paid $2,064.81 defense costs. Both the settlement amount and the defense costs are agreed to be reasonable. By this suit, Cal-Farm seeks to require Fireman's to participate pro rata according to the limits of their respective policies in the above sums expended by Cal-Farm. Essentially, the pivotal issue before us is the nature and extent of coverage, if any, afforded by Fireman's policy.

The leased 1965 Cadillac involved in the accident was owned by Lease Plans, Inc., a corporation, and was at the time of the accident being driven by Wanda Hooper, wife of the lessee, Otha Hooper.

The lease agreement, containing detailed written provisions, was for a period of two years. With respect to insurance, it provided in substance that the lessee would provide insurance to cover both the lessor and the lessee with limits of $100,000 and $300,000 for injury or death and $25,000 for property damage, and that the lessor would be named as an insured in the policy. It further provided that the lessor would be furnished with a certificate of such insurance. It stated that the lessor would not be required to provide any other insurance and the lessee agreed to indemnify the lessor from and against any and all losses, damages, injuries, claims,

demands and expenses not covered by insurance arising out of the operation or use of the automobile. At the time the lease agreement was entered into the lessee also signed a separate written "Agreement to Furnish Insurance," whereby he agreed to furnish the insurance on the automobile and in which he again agreed that Lease Plans, as the registered owner and lessor of the automobile, would be named as an insured under the policy so furnished by him.

In compliance with these lease provisions, the lessee contracted with Cal-Farm to provide the required insurance. Cal-Farm issued an endorsement to an existing policy to cover the 1965 Cadillac and with respect to that car only named Lease Plans, the lessor, as an additional insured. It also furnished a certificate of such coverage to the lessor.

Fireman's Fund issued a policy of liability insurance to Lease Plans which contained a "Leased Car Endorsement." It reads:

"SUCH INSURANCE AS IS AFFORDED UNDER THIS POLICY WITH RESPECT TO THE OPERATION OR USE OF AUTOMOBILES LEASED TO OTHERS BY THE NAMED INSURED APPLIES SUBJECT TO THE FOLLOWING PROVISIONS:

1. (a) THE INSURANCE SHALL NOT APPLY TO ANY PERSON OTHER THAN THE NAMED INSURED, HIS AGENT OR EMPLOYEE, AS RESPECTS ANY LOSS WITH RESPECT TO WHICH SUCH PERSON HAS AVAILABLE ANY OTHER VALID AND COLLECTIBLE INSURANCE WITH LIMITS AT LEAST EQUAL TO THE REQUIREMENTS OF THE FINANCIAL RESPONSIBILITY LAW.

(b) IF THERE IS NO SUCH OTHER INSURANCE AVAILABLE, THE INSURANCE AFFORDED HEREUNDER TO SUCH PERSON SHALL APPLY ONLY IN THE FOLLOWING LIMITS, AND NOT AS STATED IN THE DECLARATIONS:

COVERAGE A—BODILY INJURY LIABILITY—AUTOMOBILE:

10,000.00 EACH PERSON

20,000.00 EACH ACCIDENT

COVERAGE C—PROPERTY DAMAGE LIABILITY—AUTOMOBILE

5,000.00 EACH ACCIDENT

2. WITH RESPECT TO THE NAMED INSURED, THE INSURANCE AFFORDED UNDER THIS POLICY SHALL BE EXCESS OVER ANY OTHER VALID AND COLLECTIBE [*sic*] INSURANCE.

*Rates per Car*

B.I. $3.00

P.D. $1.00"

The exclusions and limitations on coverage referred to in the leased car endorsement were applicable to approximately 486 automobiles of which Lease Plans was lessor under agreements such as those involved herein, whereunder each of the lessees agreed to and did provide coverage similar to that provided by the lessee in the case at bench. The testimony was unrefuted that because of these exclusions and limitations the annual premium of Fireman's Fund with respect to the 1965 Cadillac was only $4, whereas, without such exclusions and limitations, the rate would have been well over $100.

It is conceded that Cal-Farm's policy provided valid and collectible insurance to the defendants in the personal injury suit in excess of the minimum Financial Responsibility Law requirements. Therefore, it is at once apparent that if the Fireman's leased car endorsement is valid and applicable under the facts in this case, that Fireman's policy did not cover the lessee or his wife (paragraph 1 (a) of the leased car endorsement), and as to Lease Plans, Inc. was excess insurance (paragraph 2 of the leased car endorsement).

Insurance Code[1] section 11580.1 as of the time of the incidents out of which this case arises (1965-1966) provided in part:

"No policy of liability insurance covering liability arising out of the ownership, maintenance or use of any motor vehicle shall be issued or delivered in this state to the owner of a motor vehicle, or shall be issued or delivered by any insurer licensed in this state, upon any motor vehicle then principally garaged or principally used in this state unless it contains the following provisions:

"
. . . . . . . . . . . . . . . .

"(d) Provision insuring the insured named therein and to the same

---

[1]Hereinafter all references to California code sections will be to the California Insurance Code unless otherwise designated.

extent that coverage is afforded such named insured in respect to said described motor vehicles, any other person using, or legally responsible for the use of, said motor vehicles, provided the motor vehicles are being used by the named insured or with his permission, express or implied. .

". . . . . . . . . . . . . . . . . . . . .

"(f) Where two or more policies are applicable to the same loss and one of such policies affords coverage to the named insured engaged in selling, repairing, servicing, delivering, testing, road testing, parking, or storing automobiles, such policies may contain a provision that the insurance coverage applicable to such motor vehicles afforded a person other than the named insured or his agent or employee shall not be applicable if there is any other valid and collectible insurance applicable to the same loss covering such person as a named insured or as an agent or employee of a named insured under a policy with limits at least equal to the financial responsibility requirements specified in Section 16059 of the Vehicle Code; and in such event, the two or more policies shall not be construed as providing cumulative or concurrent coverage and only that policy which covers the liability of such person as a named insured, or as an agent or employee of a named insured, shall apply. In the event there is no such other valid and collectible insurance, the coverage afforded a person other than the named insured, his agent or employee, may be limited to the financial responsibility requirements specified in Section 16059 of the Vehicle Code."

Cal-Farm argues that the leased car endorsement by which Fireman's attempted to exclude liability coverage to persons driving the leased car with permission is invalid as violative of the public policy of the state under the principles of *Wildman* v. *Government Employees' Ins. Co.* (1957) 48 Cal.2d 31 [307 P.2d 359], and its progeny and as codified in section 11580.1, subdivision (d), above set forth. The contention is neither novel nor meritorious. Numerous court opinions have recognized that the public policy conclusions of *Wildman* have been modified by the legislative expression contained in section 11580.1, subdivision (f), and that an insurance policy provision complying with the stipulations of that section is valid and enforceable notwithstanding the denial of coverage to a permissive user (see *National Emblem Ins. Co.* v. *Rios* (1969) 275 Cal.App.2d 70, 74-75 [79 Cal.Rptr. 583]; *Truck Ins. Exch.* v. *Wilshire Ins. Co.* (1970) 8 Cal.App.3d 553, 558-559 [87 Cal.Rptr. 604]; *Great American Ins. Co.* v. *Globe Indem. Co.* (1970) 8 Cal.App.3d 938, 944-946 [87 Cal.Rptr. 653]; *Argonaut Ins. Co.* v. *Transport Indem. Co.* (1972) 6 Cal.3d 496, 504-505, 508 [99 Cal.Rptr. 617, 492 P.2d 673]).

Cal-Farm further asserts that section 11580.1, subdivision (f), is not applicable because Wanda Hooper is not a "named insured" under the provisions of its policy. This position is specious and untenable. Wanda Hooper was the wife of and a resident of the same household with Otha Hooper. The general policy provisions of the Cal-Farm automobile insurance policy, under the title "Definitions," defines the term "named insured" as ". . . the insured named as 'insured' in the declarations and if an individual also includes his spouse, if a resident of the same household; . . ."

■ Appellant next contends that the leased car endorsement is not valid because it does not strictly conform with the provisions of section 11580.1, subdivision (f). The statute authorizes the exclusion of coverage to the permissive user ". . . if there is any other valid and collectible insurance applicable to the same loss covering such person as a named insured or as an agent or employee of a named insured. . . ." The leased car endorsement as written makes the clause applicable if the permissive user has ". . . any other valid and collectible insurance. . . ." The argument is exceedingly technical. As stated, Wanda Hooper was a named insured within the meaning of the Cal-Farm policy and, therefore, in fact fit the prescription of the statute.

We note that the Fireman's policy contained the express provision: "Terms of this policy which are in conflict with the statutes of the state wherein this policy is issued are hereby amended to conform to such statutes." However, even in the absence of such a provision, this court has held that a similar omission from the endorsement did not invalidate the endorsement and that the endorsement will be given effect to the extent that it does not violate the statute (*Truck Ins. Exch.* v. *Wilshire Ins. Co., supra,* 8 Cal.App.3d 553, 559-560; *National Emblem Ins. Co.* v. *Rios, supra,* 275 Cal.App.2d 70, 76, 77). In *Truck Ins. Exch.* v. *Wilshire Ins. Co., supra,* which involved a similar factual omission, the identical argument was dealt with at some length. This court said:

"We agree with appellants' next contention that the exclusion of permissive users of the insured's vehicles, as set forth in endorsement ET-279, is broader than that permitted by subdivision (f) of section 11580.1. The endorsement excludes all accidents as to which the permissive user has 'other valid and collectible automobile liability insurance' whether he is the named insured in the policy or not. But, subdivision (f), apparently to forestall innumerable disputes as to whether a permissive user is in fact covered by other insurance, refers only to accidents for which the permis-

sive user is covered by other valid and collectible insurance 'as the named insured or as the agent or employee of a named insured.' [Citation.] Furthermore, under the subdivision the permissive users' insurance coverage must be 'at least equal to the financial responsibility requirements specified in section 16059 of the Vehicle Code,' whereas the endorsement refers to a policy 'with limits of liability at least equal to the minimum limits specified by the financial responsibility law of the state in which the automobile is principally garaged.'

"Nevertheless, we do not agree that this overbroadness renders the endorsement totally void as appellants maintain. Presumably, Exchange intended its endorsement to conform to the insurance laws of this state. In addition, it gave Arnold Wiebe Buick a substantial discount in order to limit its exposure under the policy. Thus, to categorically declare that the exclusion is totally void places too high a premium on language and sets a precedent which could unduly penalize insurance companies which act in good faith. We hold that endorsement ET-279 is merely ineffective insofar as it exceeds the permissible limits of subdivision (f). And, because at the time of her accident with George T. Dudney appellant Charlotte Preston was the named insured in the Wilshire policy, a valid and collectible insurance policy with limits equal to the financial responsibility requirements of Vehicle Code section 16059, the broad language of the challenged endorsement is not critical in this case." (At pp. 559-560; fn. omitted.)

We do not construe the cases relied upon by appellant as bolstering a contrary position. They are *Atlantic Nat. Ins. Co.* v. *Armstrong* (1966) 65 Cal.2d 100 [52 Cal.Rptr. 569, 416 P.2d 801], *Cannizzo* v. *Guarantee Ins. Co.* (1966) 245 Cal.App.2d 70 [53 Cal.Rptr. 657], and *Glens Falls Ins. Co.* v. *Globe Indem. Co.* (1969) 276 Cal.App.2d 643 [81 Cal.Rptr. 28]. In each of those cases the insurance company involved had made no effort whatsoever to incorporate into the policy particular provisions of the Insurance Code authorizing the company to be relieved of liability. For example, in the *Glens Falls* case, which is the only one dealing with section 11580.1, subdivision (f), there was no provision at all in the policy relating to that section. The court noted that since the company had not written the provision into the policy and it was not required to be in the policy, it would not rewrite the insurance policy for the insurance company. There was no conflict between the policy provisions and express requirements of any statute. It was merely a matter of something not having been put into the policy at all.

The factual situation is inapposite to the case at bench where the company bargained for and did in fact write in the exclusion authorized by the section, but, by its language, was in a minor way overbroad. There was a conflict between the policy provision and the statute, and the effect of our holding is to automatically amend the policy provision to conform to the requirements of the statute. This we are authorized to do not only by virtue of the express provisions of the policy itself above referred to but by virtue of the legal principles independent of the policy provision (compare: Civ. Code, § 1643; see *Voris* v. *Pacific Indemnity Co.* (1963) 213 Cal.App.2d 29, 31 [28 Cal.Rptr. 328]).

■ Lastly, Cal-Farm contends that Lease Plans was not engaged in "selling, repairing, servicing, delivering, testing, road testing, parking, or storing automobiles. . . ." It argues that the document under the terms of which the Hoopers came into possession of the automobile was by its express terms a lease and "leasing" is not within the aforementioned statutory definition. The trial court, however, found, notwithstanding the form of the transaction and the nomenclature employed, that Lease Plans was in fact engaged in the business defined in section 11580.1, subdivision (f). The findings in part state:

"Fireman's Fund's insurance policy was a single policy insuring both Fresno Motor Sales Company and Lease Plans, Inc., as one business and as named insureds under said policy. Both Fresno Motor Sales Company and Lease Plans, Inc., were engaged in the business of selling, repairing, servicing, delivering, testing and roadtesting automobiles. Fresno Motor Sales Company was the authorized Cadillac-Oldsmobile dealer and sales agency in Fresno, and Lease Plans, Inc., as an adjunct to said dealership and sales agency, usually sold automobiles under and by means of a lease plan whereby the prospective purchaser took possession of said automobile under a lease pending the completion of said sale."

The determination that we have to make is whether there is substantial evidence in the record to support that finding. The Supreme Court has recently summarized the often repeated applicable appellate principles:

"The crucial question in considering defendants' first contention is whether there is any substantial evidence to support the trial court's findings. 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]

" 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.]" (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, at p. 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

"In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment [citation]. All issues of credibility are likewise within the province of the trier of fact. [Citation.] 'In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.*' [Citation.] All conflicts, therefore, must be resolved in favor of the respondent. [Citation.]" (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, at pp. 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

There is an overmeasure of evidence to support this finding. There was testimony that both Fresno Motor Sales and Lease Plans, Inc. were corporations, the stock of which was all owned by one man, Jim R. Phelan. Both had one common office. Both operated their business in the same building. Lease Plans, Inc. had no separate physical facilities. Aside from a full-time manager, all operations of Lease Plans, Inc. were carried on by Fresno Motor Sales' employees, including salesmen, mechanics, bookkeepers, etc. The separate corporate entities were used on the advice of counsel for tax, insurance, and other reasons.

Fresno Motor Sales was a franchised Cadillac-Oldsmobile dealer. The operations of Lease Plans, Inc. dovetail into the Cadillac-Oldsmobile franchise. The primary purpose and objective of both companies was to merchandise and sell automobiles at a profit. If a customer wished to buy an automobile for cash or on a conditional sales contract, the transaction would go through the books of Fresno Motor Sales. If he wished to use the lease plan, the transaction would go through the books of Lease Plans, Inc.

The lease plan was just a medium for selling Cadillac and Oldsmobile automobiles. It was an innovative method of selling of which Fresno Motor Sales took advantage. The lease was a vehicle for selling. In all cases the car was ultimately sold before the lease obligations were terminated.

At the time the lease was entered into a base sales price was agreed upon. When the lease was terminated the sale was completed either by a

transfer of title to the lessee or a sale to a wholesaler or dealer. If the rentals paid in plus the amount for which the car could be sold were more or less than the base price agreed upon, the lessee was required to pay to Lease Plans, Inc. or to receive back from Lease Plans, Inc. whatever amount was necessary to net the full base sales price to Lease Plans, Inc.

In all cases the customer paid a sales tax.

If there was any trouble with the vehicles leased, the manager of Lease Plans, Inc. would try to diagnose the trouble, give the car a road test, if necessary, and then turn it over to mechanics employed by Fresno Motor Sales for repairs.

The two corporations were operated as one business and the Fireman's policy insured both corporations as one business under a single policy.

On this record, the trial court was justified in piercing through the form of the transaction to the substance and in making the finding that Lease Plans was engaged in the business referred to in section 11580.1, subdivision (f). We conclude that under the leased car endorsement the trial court was correct in denying relief to Cal-Farm against Fireman's and in determining that Cal-Farm was solely responsible for the settlement and defense costs of the third party claim.

The trial court also held that there were two other separate but cognate bases for arriving at its ultimate conclusion that Fireman's should prevail. These were: (1) That it was the intention of all the parties that Cal-Farm would furnish primary insurance and that any other insurance would be excess (*Pacific Indem. Co. v. Liberty Mut. Ins. Co.* (1969) 269 Cal. App.2d 793, 799 [75 Cal.Rptr. 559]). (2) Fireman's policy, in any event, was excess to that of Cal-Farm under the basic insuring agreement of Fireman's policy, which provided in substance that the insurance afforded was excess only (special condition G).[2]

---

[2]Special condition G provides in pertinent part:
"The insurance under this policy shall be excess insurance with respect to loss against which the named insured has other insurance disclosed to the Company as in effect on the effective date of this policy and upon the basis of which premium credit for other insurance is given but shall apply only in the amount by which the applicable limit of liability stated in the declarations exceeds the total applicable limits of liability of all valid and collectible insurance upon the basis of which premium credit is given."

As the judgment is affirmed on the ground that section 11580.1, subdivision (f), was applicable, it is unnecessary for us to reach or consider the other two grounds upon which the trial court found against Cal-Farm and in favor of Fireman's Fund. .

The judgment is affirmed.

Stone, P. J., and Gargano, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 2, 1972.